**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re Weatherford International PLC (2019) Securities Litigation | § | Civil Action H-19-3363 |
| | § | JURY TRIAL DEMANDED |
| | § | Judge Lynn N. Hughes |
| | § | CLASS ACTION |
| | § | **CONSOLIDATED CLASS ACTION COMPLAINT** |

# TABLE OF CONTENTS

**Page**

I. NATURE OF THE ACTION ..... 2

A. Defendants' Fraudulent "Transformation Plan" ..... 2

B. The Transformation Plan was Inadequate to Save Weatherford from Bankruptcy ..... 5

C. The Truth Was Finally Revealed to Investors—Causing Them Harm ..... 7

II. JURISDICTION AND VENUE ..... 8

III. PARTIES ..... 9

A. Lead Plaintiff ..... 9

B. Defendants ..... 10

1. Corporate Defendant ..... 10

2. Individual Defendants ..... 10

C. Relevant Third Parties ..... 13

IV. SUBSTANTIVE ALLEGATIONS OF FRAUD ..... 19

A. Prior to the Class Period, Weatherford Engaged in an Aggressive Acquisition Strategy that Caused the Company to Become Overleveraged and Caused Internal Personnel to Believe the Company Was No Longer a Going Concern ..... 19

B. Despite Its Financial Peril, Weatherford Falsely Assured Investors It Had Implemented a Plan to Lower Costs, Become Profitable, and Avoid Bankruptcy ..... 21

1. Weatherford Claimed that It Had Implemented a Plan to Become Profitable and Was in "Recovery Mode" ..... 24

2. The Board Removed Defendant Duroc-Danner but the New Management Team Continued to Mislead the Public About Weatherford's Supposed Recovery ..... 26

3. Defendant McCollum Introduced His Formal Transformation Plan ..... 29

4. In The Face of Rising Debt, Defendants Announced Additional Measures to Control Costs ....................................................31

5. Notwithstanding Known Failures, Defendants Continued to Tout the Transformation Plan and the Company's Viability.....................33

C. Fifteen Former Weatherford Employees Contradict Defendants' Class Period Statements Concerning Weatherford's Transformation Plan and Ability to Avoid Bankruptcy.......................................39

1. Weatherford's Supposed Cost Savings Measures Consisted of a Corporate Policy to Avoid Paying Its Vendors, an Accounting Trick to Temporarily Boost Its Cash Flow............................40

2. Defendants Knew the Transformation Plan Was Insufficient and Would Not Reduce Weatherford's Debt.........................47

3. The Transformation Plan Was at Best Ineffectual and at Worst Detrimental to Weatherford's Financial Condition........................50

4. Weatherford's Cost-Cutting Initiatives Were a Drop in the Bucket Compared to the Over $7 Billion of Debt ....................................54

5. Bankruptcy Was Internally Discussed as a Likely Option Throughout the Class Period...................................................................56

6. A Corporate Accounting Leader at Weatherford Explained that a Going Concern Opinion Should Have Been Issued as Far Back as 2016.......................................................................................57

D. Defendants Admit They Previously Knew They Would Not Improve Their Financial Condition as Much as They Touted, Partially Revealing the True Effects of Weatherford's Massive Debt...................................................................................................59

E. Despite the Partial Revelation of Weatherford's True Financial Condition, Defendants Continued to Reassure Investors .....................................61

F. Weatherford's Stock Price Fell Dangerously Low ...............................................62

G. Defendants Publicly Rejected Bankruptcy as an Option While They Were on the Eve of Bankruptcy............................................................64

H. Weatherford Was Unable to Outrun Its Past and Announced Chapter 11 Bankruptcy Protection........................................................................68

V. DEFENDANTS' FALSE AND MISLEADING STATEMENTS ....................................72

A. Defendants' False and Misleading Statements During 2016 ....72

1. October 26, 2016 – 3Q 2016 Earnings Call ....72

2. October 28, 2016 – 3Q 2016 Form 10-Q ....74

3. November 9, 2016 – Wall Street Journal Article ....75

B. Defendants' False and Misleading Statements During 2017 ....76

1. February 1, 2017 – Form 8-K ....76

2. February 2, 2017 – 4Q 2016 Earnings Call ....76

3. February 14, 2017 – 2016 Form 10-K ....77

4. November 1, 2017 – 3Q 2017 Earnings Call ....77

C. Defendants' False and Misleading Statements During 2018 ....79

1. February 2, 2018 – Press Release Attached to Form 8-K ....79

2. February 2, 2018 – 4Q 2017 Earnings Call ....79

3. February 13, 2018 – Credit Suisse Energy Summit ....80

4. February 14, 2018 – 2017 Form 10-K ....81

5. March 13, 2018 – 2017 Annual Report ....81

6. April 24, 2018 – Press Release Attached to Form 8-K ....82

7. April 24, 2018 – 1Q 2018 Earnings Call ....82

8. July 27, 2018 – Press Release Attached to Form 8-K ....82

9. July 27, 2018 – 2Q 2018 Earnings Call ....83

10. September 5, 2018 – Barclays Energy Power CEO Conference ....83

11. October 29, 2018 – 3Q 2018 Earnings Call ....84

D. Defendants' False and Misleading Statements During 2019 ....86

1. February 1, 2019 – Press Release Attached to Form 8-K ....86

2. February 1, 2019 – 4Q 2018 Earnings Call ....86

3. February 15, 2019 – 2018 Form 10-K ....89

4. May 1, 2019 – 2018 Annual Report ....................90

VI. THE TRUTH ABOUT THE FULL IMPACT OF THE FRAUD IS GRADUALLY REVEALED ....................90

VII. LOSS CAUSATION ....................95

A. October 29, 2018 – First Partial Corrective Disclosure/Materialization of the Risk ....................96

B. May 10, 2019 – Final Corrective Disclosure/Materialization of the Risk ....................98

VIII. ADDITIONAL INDICIA OF SCIENTER ....................102

A. The Transformation Plan's Ability to Pay Down the Company's Massive Debt Was Critical to Weatherford's Continued Viability ....................102

B. Defendants' Statements Support a Strong Inference of Scienter ....................106

C. Defendants Admitted They Would Not Meet Their Targets ....................109

D. Defendants Were Motivated to Negotiate the Management Incentive Plan ....................109

IX. CONTROL PERSON ALLEGATIONS ....................111

X. CLASS ACTION ALLEGATIONS ....................112

XI. APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE ....................114

XII. NO SAFE HARBOR ....................116

XIII. CAUSES OF ACTION ....................118

COUNT I Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Against All Defendants except Defendant Blanchard ....................118

COUNT II Violation of Section 20(a) of the Exchange Act Against All Individual Defendants ....................120

PRAYER FOR RELIEF ....................121

JURY DEMAND ....................121

Court-appointed Lead Plaintiff Utah Retirement Systems ("Lead Plaintiff" or "URS"), individually and on behalf of all persons and entities who, during the period from October 26, 2016 through May 10, 2019, inclusive (the "Class Period"), purchased the publicly traded common stock of Weatherford International plc ("Weatherford," "WFT," or the "Company") and were damaged thereby (the "Class") brings this Consolidated Class Action Complaint against Defendants Weatherford, several of Weatherford's senior executives—former Chairman and Chief Executive Officer ("CEO") Bernard Duroc-Danner, former Chief Financial Officer ("CFO") and CEO Krishna Shivram, current President and CEO Mark McCollum, former Executive Vice President ("EVP") and CFO Christoph Bausch, current Vice President and Chief Accounting Officer ("CAO") Stuart Fraser, former Vice President and CAO Douglas M. Mills, and current EVP and Chief Operating Officer ("COO") Karl Blanchard ("Individual Defendants," and together with Weatherford, "Defendants").[1]

Lead Plaintiff's claims are brought upon personal knowledge as to its own acts, and upon information and belief as to all other matters, based upon, among other things, a review and analysis of: (1) reports and documents filed by Weatherford with the Securities and Exchange Commission; (2) reports issued by analysts covering or concerning Weatherford and its business; (3) press releases, news articles, transcripts, videos, and other public statements issued by or about Weatherford, its business, and the Individual Defendants; (4) an investigation conducted by URS's attorneys, including interviews with former Weatherford employees; and (5) other publicly available information concerning Weatherford, its business, and the allegations

[1] The following are excluded from the Class: (1) Defendants; (2) members of the immediate family of any Defendant who is an individual; (3) any person who was an officer or director of Weatherford during the Class Period; (4) any firm, trust, corporation, or other entity in which any Defendant has or had a controlling interest; (5) Weatherford's employee retirement and benefit plan(s), if any, and their participants or beneficiaries, to the extent they made purchases through such plan(s); and (6) the legal representatives, affiliates, heirs, successors-in-interest, or assigns of any such excluded person or entity.

contained herein. Lead Plaintiff believes that substantial additional evidentiary support exists for the allegations herein and will continue to be revealed after Lead Plaintiff has a reasonable opportunity for discovery.

## I. NATURE OF THE ACTION

1. This securities fraud action arises from the events leading to the Chapter 11 Bankruptcy of once-giant oilfield company Weatherford, which at its peak was valued at more than $50 billion and at the time of filing for protection had fallen $8.35 billion in debt.

### A. Defendants' Fraudulent "Transformation Plan"

2. Weatherford fell into financial trouble by pursuing an overly aggressive strategy to gain market share by acquiring over one hundred of its smaller competitors. Instead of organically growing its business and using cash to fund its acquisitions, Weatherford took on massive and unsustainable debt to pay for its rapid and ill-conceived expansion. Not surprisingly, Weatherford could not properly integrate and manage the large number of companies it had acquired and as a result it quickly became impossible for Weatherford to service its massive debt, which by the start of the Class Period in October 2016 had reached a staggering $7.1 billion.

3. However, to quell concern that the Company was headed for bankruptcy, Defendants assured investors they had a well-implemented and executed "Transformation Plan" that would quickly return Weatherford to profitability, reduce the Company's debt, and avoid bankruptcy. Unfortunately for investors, that was not true. Indeed, all of Weatherford's internal indications demonstrated that Defendants ***knew*** the Company was rapidly losing money, that its much-touted "Transformation Plan" was not going to work and that Weatherford's bankruptcy was a matter of when, not if.

4. On October 26, 2016, the first day of the Class Period, Weatherford told investors that its debt and accounting problems were behind the Company. On that day, Defendants announced to investors that they were turning the corner, changing their business models, and engaging in drastic cost cutting initiatives such as closing facilities, laying off employees, and selling off assets that were not part of the Company's core strategy. As a result of the measures, which according to Defendants had already been put in place, they confidently claimed that Weatherford was now "in recovery mode." Shortly thereafter, Defendants introduced a formalized plan of recovery, known as the Transformation Plan, which consisted of over 1,500 initiatives supposedly aimed at reducing the Company's debt and ensuring a viable future for Weatherford. Defendants stated that such measures included reducing personnel, closing facilities, and selling parts of the Company. These measures, Defendants explained, purportedly would improve profitability and margins.

5. During the Class Period, Defendants consistently assured investors that the Company's measures were "***permanent and sustainable,***" and that Weatherford "***ha[d] enough liquidity to manage [the Company's] needs***." Defendants specifically touted at the beginning of the Class Period that the Transformation Plan would achieve certain financial targets, such as "$1 billion in profit improvements over the next 18 to 24 months." Defendants further led investors to believe that the Transformation Plan was making "***significant***" and "***material***" progress and was "***on track***" to reducing the Company's debt. And importantly, Defendants also told investors there was "***no remote possibility***" that the Company would not be able to manage its debt, assuaging any bankruptcy concerns by explaining that they "***don't waste a lot of time thinking or planning how to fail***," which analysts unmistakably understood as confirming bankruptcy was not even being considered by management.

6. Throughout the Class Period, Defendants continuously misled investors into believing they were capable of, and in fact were on track to, reducing the Company's massive debt and avoiding bankruptcy. Indeed, analyst RBC Capital Markets ("RBC") reported in February 2018 that "[w]e believe that [Weatherford] is on track to successfully execute its turnaround and [T]ransformation [P]lan." Cowen reported that they "continue to be believers in the turnaround." Notably, even as late as February 2019, in direct reliance on Defendant McCollum's misstatements, analyst RBC reported: "Bottom line, the CEO sees no reason for WFT to consider a bankruptcy/capital restructuring." The same report noted that "WFT has sufficient liquidity to address the 2020 debt." Similarly, analyst Credit Suisse reported that same day that Weatherford was "Not Dead Yet," and explained that "WFT is not likely to declare bankruptcy in 2019."

7. Critically, Defendants also told investors that the recovery and the Company's successes to date were quantifiable because they were based on Weatherford's own internal profitability analyses. Defendants unequivocally told investors that "***based on all the benchmarking and internal analysis we have done, we believe these targets can definitely be achieved***," and reassured investors that they "***develop[ed] rigorous, detailed plans***" that "***validate[d] our ability to***" achieve the profitability and debt targets Defendants imparted to investors. Defendant McCollum on multiple occasions touted that the Company's ability to achieve these targets is "***undeniable***" and "***realistic***," and told investors that "***I'm staking my career on that***." Defendants similarly led investors to believe that Weatherford was not struggling financially because they "***have been making normal payments to our vendors, which in a sense is similar to paying down debt obligations***."

8. Analysts were encouraged by Defendants' concrete reassurances. In fact, the same day that Defendants assured that the Company was on track to meet its goals and reduce its debt based on internal analyses, analyst Wells Fargo reported on November 1, 2017 that "with a solid turnaround story coming into focus and a path to deleveraging, we continue to highlight [Weatherford] as the best special situation stock in our OFS [Oilfield Services] universe with the potential for 50–75% upside." Analyst Cowen and Company similarly reported the next that "[w]e continue to view [Weatherford] as a unique turnaround opportunity within OFS, as new leadership has performed a full scale business review and laid out initial plans to 'aggressively' drive change." Likewise, in June 2018, analyst RBC reported that the "[C]ompany is still on track in terms of dollar and timing of its $1bn [T]ransformation [P]lan," and a month later, in July 2018, analyst Evercore ISI ("Evercore") reported that "Weatherford continues to make tangible and material progress on its Transformation program as CEO Mark McCollum's strategic vision starts to crystalize." Similarly, in September 19, 2018, analyst G.research LLC of Gabelli Securities reported that "the restructuring program is on track, if not ahead of schedule."

**B. The Transformation Plan was Inadequate to Save Weatherford from Bankruptcy**

9. In reality, and unbeknownst to investors, the Transformation Plan was riddled with issues from the start, failed to meaningfully reduce the Company's debt, and was not designed to prevent Defendants from going bankrupt. Multiple former Weatherford employees confirmed that the Transformation Plan was nothing more than a hastily assembled list of employee suggestions that primarily consisted of old, ineffective efforts that the Company was already engaged in, or untested suggestions from low-level management that were actually harmful to the Company.

10. For instance, many of the initiatives were in fact causing additional harm to the Company, such as cutting certain positions needed to process service orders and thus leaving important divisions with insufficient resources to keep up with demand, or shifting power to the Sales Division to the point where salespersons were no longer accountable to the Operations Division and received bonuses simply for generating cash flow—not for generating profit—and therefore were incentivized to and did enter into deals where the Company incurred a loss.

11. Furthermore, any revenue that Weatherford was able to generate from sales of parts of its business was a mere drop in the bucket compared to the over $7 billion and growing debt Weatherford had on its books. Weatherford's precarious financial condition during the Class Period was further evidenced by former employees who stated that, contrary to its Class Period representations, Weatherford was not paying its bills, and was purposefully delaying payments to the Company's vendors, again causing further harm to the Company despite having its intended effect of making it seem like Weatherford had more cash on hand than it really did.

12. Notably, during the Class Period, Defendants were well aware of the Transformation Plan's failures to reduce the Company's debt and inevitable bankruptcy. Not only were the Transformation Plan's progress and the Company's high debt the number one priority and concern for Weatherford, but the Individual Defendants took affirmative efforts to inform themselves of Weatherford's current financial condition and the effectiveness of the Transformation Plan throughout the Class Period.

13. Indeed, according to former Weatherford employees, the Company held weekly or biweekly meetings with teams of Weatherford employees charged with implementing the Transformation Plan's initiatives (the "Transformation Team"), where issues with the

Transformation Plan's effectiveness were raised and discussed. As one former senior manager explained, the meetings were attended by the senior managers and corporate executives.

14. Likewise, Defendant McCollum himself explained that he was holding "staff meetings at my level" with those familiar with the Transformation Plan's progress to hold them accountable. Additionally, one former Weatherford employee confirmed that Defendants were aware of (or chose to ignore) internal profit and loss statements that indicated that the Transformation Plan was not working to reduce Weatherford debt, as well as other reports and updates regarding the Transformation Plan's lack of progress.

15. Defendants understood from, among other things, these meetings and the ineffectiveness of the Transformation Plan that Weatherford's cost-cutting measures were not able to save the Company from bankruptcy. Nonetheless, Defendants continuously touted the opposite to investors. For example, three months before the end of the Class Period, Weatherford's CEO Defendant McCollum told investors that "***I don't waste a lot of time thinking or planning how to fail***" while ***having previously retained bankruptcy counsel to advise on the Chapter 11 restructuring***.

**C. The Truth Was Finally Revealed to Investors—Causing Them Harm**

16. The truth of the Transformation Plan's failure to reduce the Company's debt began to emerge on October 29, 2018, when Defendants announced shocking and disappointing earnings results for the third quarter of 2018, including that they were "short of our goal of positive cash flow for the quarter." Defendants further partially revealed for the first time that progress towards their targets had been slower than they have wanted.

17. In fact, Defendant McCollum conceded that Defendants "knew coming into the year" that they "would probably still fall somewhat short in 2018 for generating breakeven cash flow" despite telling investors the exact opposite just months earlier. These revelations and

concessions caused the price of Weatherford's common stock to fall ***22.22%*** to $1.54 per share at close on Monday, October 29, 2018, and to further fall to $1.26 per share at close on October 30, 2018, an additional ***18.18%***, as the market further digested the troubling news. Yet, Weatherford dismissed the poor earnings results and lack of progress as mere "***bumps in the road***," and continued reassuring investors that Weatherford's turnaround was underway and it would achieve its profitability targets by year end 2019.

18. Shortly thereafter, Weatherford's stock began trading below $1.00, which prompted the SEC to issue Weatherford a written notice in December 2018 informing the Company that Weatherford's stock was at-risk of being delisted from the NYSE.

19. Despite Defendants' false assurances, on May 10, 2019, the full truth was finally revealed to investors when Defendants disclosed that the Company was seeking Chapter 11 bankruptcy protection and that Defendants "still face a high level of debt that affects our ability to make investments in our Company and implement further elements of our [T]ransformation [P]lan." Learning that Weatherford would have to file for bankruptcy for the first time, the market's reaction was severe: Weatherford's share price plummeted more than ***86%*** resulting in catastrophic losses for investors.

## II. JURISDICTION AND VENUE

20. These claims arise under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

21. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

22. Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)). Substantial acts in furtherance of the

alleged fraud or the effects of the fraud occurred in this Judicial District. Many of the acts charged herein, including the dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District. Weatherford maintains offices in this Judicial District, and at least one of the Individual Defendants is employed by Weatherford in this Judicial District.

23. In connection with the acts, transactions, and conduct alleged herein, Defendants, directly and indirectly, used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, or the facilities of a national securities exchange.

## III. PARTIES

### A. Lead Plaintiff

24. On January 15, 2020, the Court appointed URS to serve as Lead Plaintiff pursuant to the Private Securities Litigation Reform Act of 1995 ("PSLRA"). URS provides retirement and insurance benefits exclusively for Utah public employees. URS serves more than 200,000 members and about 470 public employers, including the State of Utah, its local governments, school districts, and universities. URS is a component unit of the State of Utah, governed by Utah Code Title 49, and URS administers eight defined benefit pension systems and four IRS-qualified retirement savings plans. URS purchased Weatherford securities during the Class Period, and suffered damages as a result of the federal securities law violations alleged herein. A list of URS's Class Period transactions is included in Lead Plaintiff's certification submitted with its application to be named Lead Plaintiff. (ECF No. 23-2).

**B. Defendants**

**1. Corporate Defendant**

25. Weatherford operates in approximately 80 countries and provides equipment and services used in the drilling, evaluation, completion, production, and intervention of oil and natural gas wells. Weatherford is registered as an Irish public limited company headquartered in Switzerland. The Company's American corporate offices and headquarters are located in Houston, Texas. During the Class Period, Weatherford's shares were registered with the SEC and listed on the NYSE under the symbol "WFT." Weatherford filed periodic reports, including Forms 10-K and 10-Q, with the SEC pursuant to Exchange Act Section 13(a) and related rules thereunder.

**2. Individual Defendants**

26. Defendant Bernard Duroc-Danner ("Duroc-Danner") is the former Chairman of the Board of Directors and CEO of Weatherford. Defendant Duroc-Danner left the Company in November 2016. In addition to making misleading statements on earnings calls and interviews as discussed herein, Defendant Duroc-Danner signed Weatherford's Third Quarter 2016 Form 10-Q dated October 28, 2016 ("3Q 2016 Form 10-Q"), which incorporated by reference materially false and misleading statements and omissions of material facts as detailed below.

27. Defendant Krishna Shivram ("Shivram") was the CFO of Weatherford from November 2013 until December 2016. Defendant Shivram served as Weatherford interim CEO from November 2016 to March 2017. In addition to making misstatements on earnings calls and in press releases as discussed herein, Defendant Shivram signed Weatherford's 3Q 2016 Form 10-Q and Weatherford's 2016 Form 10-K dated February 14, 2017 ("2016 Form 10-K"), each of which contained materially false and misleading statements and omissions of material facts as detailed below.

28. Defendant Mark McCollum ("McCollum") is the current President and CEO of Weatherford. Prior to joining Weatherford in March 2017, Defendant McCollum served as the EVP and CFO of Halliburton Company ("Halliburton"), one of Weatherford's top competitors. In addition to making misstatements on earnings calls and in press releases as discussed herein, Defendant McCollum signed Weatherford's 2017 Form 10-K dated February 14, 2018 ("2017 Form 10-K"); Weatherford's 2018 Form 10-K dated February 15, 2019 ("2018 Form 10-K"); Weatherford's 2017 Annual Report published on March 13, 2018 ("2017 Annual Report"); and Weatherford's 2018 Annual Report published on May 1, 2019 ("2018 Annual Report"), each of which contained materially false and misleading statements and omissions of material facts as detailed below.

29. Defendant Christoph Bausch ("Bausch") was the EVP and CFO of Weatherford. Defendant Bausch became the CFO in December 2016. Defendant Bausch joined Weatherford in May 2016 as the Vice President and Controller, Product Lines. In addition to making misstatements on earnings calls as discussed herein, Defendant Bausch signed the 2016 Form 10-K; 2017 Form 10-K; 2018 Form 10-K; Forms 8-K dated February 1, 2017; February 2, 2018; April 24, 2018; July 27, 2018; and February 1, 2019, each of which contained materially false and misleading statements and omissions of material facts as described below. Defendant Bausch also signed Weatherford's Forms 10-Q dated April 28, 2017; August 1, 2017; November 1, 2017; May 2, 2018; August 9, 2018; and November 2, 2018, each of which incorporated by reference materially false and misleading statements as detailed below.

30. Defendant Stuart Fraser ("Fraser") is the current Vice President and CAO, aka Principal Accounting Officer ("PAO"), of Weatherford, and has held that position since April 2018. In this role, Defendant Fraser oversees the accounting and financial reporting functions

for the Company and has been responsible for supporting the recent capital market transactions to reduce the Company's debt ratio and streamline the cost structure. Defendant Fraser signed the 2018 Form 10-K, which contained materially false and misleading statements and omissions of material facts as detailed below. Defendant Fraser also signed Weatherford's Forms 10-Q dated May 2, 2018; August 9, 2018; and November 2, 2018, each of which incorporated by reference materially false and misleading statements as detailed below.

31. Defendant Douglas M. Mills ("Mills") was the Vice President and CAO / PAO of Weatherford from June 2013 until April 2018. Defendant Mills signed the 2016 Form 10-K and 2017 Form 10-K, each of which contained materially false and misleading statements and omissions of material facts as detailed below. Defendant Mills also signed Weatherford's Forms 10-Q dated April 28, 2017; August 1, 2017; and November 1, 2017, each of which incorporated by reference materially false and misleading statements as detailed below.

32. Defendant Karl Blanchard ("Blanchard") is the EVP and COO of Weatherford. Defendant Blanchard assumed this position in August 2017. In his role at Weatherford, Defendant Blanchard oversees all region and product line operations, QHSE (Quality, Health, Safety and Environmental), sales, engineering, R&D, and supply chain.

33. Together, Defendants Duroc-Danner, Shivram, McCollum, Bausch, Fraser, Mills, and Blanchard are referred to herein as the "Individual Defendants." The Individual Defendants, by virtue of their high-level positions at Weatherford, directly participated in the management of the Company, were directly involved in the day-to-day operations of the Company at the highest levels, and were privy to confidential proprietary information about the Company, its business, operations, internal controls, growth, financial statements, and financial condition, as alleged herein.

### C. Relevant Third Parties[2]

34. **Former Weatherford Employee ("FE") 1** worked at Weatherford's Houston headquarters from January 2014 until January 2019. In January 2014, FE 1 began working as the Global Account Director where he was responsible for managing the Chevron account. In that role, FE 1 was also responsible for reforming Weatherford's Sales Division. In 2017, FE 1 was promoted to Vice President of Account Management. In that role, FE 1 was responsible for managing about 25 sales vice presidents and directors, each of which were assigned a key Weatherford account. FE 1 continued to manage the Chevron account. FE 1 reported to Lance Marklinger ("Marklinger"), who reported directly to Defendant Duroc-Danner. FE 1 frequently interacted with senior company leadership and officers, who worked on the 12th floor of the building. For example, FE 1 frequently communicated with Defendant Fraser, who reported directly to Defendant Bausch. FE 1 also on a few occasions traveled to Angola with Defendant Fraser when issues arose there related to finances. FE 1 often interacted with John Wilson ("Wilson"), who FE 13 explained was in charge of the Transformation Plan. FE 1 explained that he had one-on-one conversations with Wilson related to the status of the Transformation Plan. FE 1 also had discussions with Defendant Blanchard, Marklinger, and Wilson about the Transformation Plan's likelihood of success.

35. **FE 2** worked at Weatherford from July 2010 until September 2019 beginning as a design engineer, engineering supervisor, and eventually as a member of the Transformation Team. As part of FE 2's job and responsibilities as a design engineer and engineering supervisor, he led continuing projects at Weatherford and worked in research and development to identify new products for the marketplace. In late May to early June of 2018, FE 2 was assigned

[2] All Former Employees are referred to with male pronouns, regardless of gender, to protect their identity.

to the Transformation Team that was overseeing the initiatives set forth in the Company's Transformation Plan and was placed in a role that specifically oversaw global sales. In this role, FE 2 analyzed the effectiveness of the Transformation Plan and worked to check on progress made toward completing the initiatives. In 2019, FE 2 was promoted to a position that supervised western hemisphere commercialization. In this role, FE 2 was tasked with working with teams to increase their profitability, where the main goal they were asking for was to establish a new daily rate increase that was 20 percent higher than before on labor rates, environmental charges, and a "vast array of things." FE 2 also met with product line directors and the VP of Operations to make sure they were implementing price increases. These were usually discussed via conference calls that varied in frequency from weekly to monthly during the Class Period. FE 2 would then audit those employees' sales tickets to confirm that they were charging the higher prices.

36. **FE 3** worked for Weatherford at the Houston headquarters from April 2007 until September 2019 as a Global Technology Champion. FE 3's jobs and responsibilities included overseeing the quality management for Weatherford's Wireline Division for the United States. FE 3 managed operations and assets, and had an active role in recruiting and training. FE 3 provided oversight of field operations, developing plans and assembling teams of people to remedy any problems. During his tenure, FE 3 also had access to and reviewed Weatherford's monthly internal profit and loss statements in the Wireline Division, and sat in on calls with other divisions where profit and loss statements were discussed. FE 3 attended meetings with the U.S. Wireline Division and McKinsey & Company ("McKinsey"). During his tenure at Weatherford, FE 3 most recently reported to Robert Born, who in turn reported to Chip Miller, who reported to Mark Swift, who reported to the C-Suite.

37. **FE 4** worked for Weatherford at the Houston headquarters from March 2012 until June 2019 in several positions in the marketing department and as a member of the Transformation Team. Specifically, FE 4 started working at Weatherford as a Marketing Communications Coordinator, was promoted to Marketing Project Manager in 2013, and was promoted again to Marketing Communications Manager in 2015. In his earlier marketing positions, FE 4 was responsible for marketing various product lines within Weatherford. When the Company launched its Transformation Plan in 2017, FE 4 was transferred to work as the Change Management and Communications Manager on the Transformation Team, where he met with various internal groups and departments to help them articulate their problem areas and incorporate changes that would cut costs and produce revenue. FE 4 also recalled that he was responsible for handling the backend functions to put processes in place. During the Class Period, FE 4 attended team meetings where he voiced objections and questioned the method of the Transformation Plan. FE 4 was transferred to the project management office under the director of Global Business Support Center ("GBSC"), who reported to the transformation director and the Chief Operations Officer. FE 4 stated that during his tenure, he had multiple supervisors, the most recent of which was Director of GBSC, Farhana Janmohamed. FE 4 explained that the Director of GBSC reported to the CFO, and that the Transformation Team reported to Defendant Bausch and then Defendant Blanchard.

38. **FE 5** worked for Weatherford at the Houston headquarters from July 2018 until March 2019 as a Senior Western Hemisphere Logistics Manager. FE 5 was responsible for implementing global logistics strategies goals within the Western Hemisphere. FE 5 was also part of the Transformation Team, and as part of the Transformation Team, FE 5 explained that during his tenure at Weatherford, he attended (sometimes weekly or at a minimum bi-weekly)

leadership meetings to discuss the Transformation Plan as it related to the Company's Global Logistics team. FE 5 recalled that these leadership meetings were held in the mornings at the Company's "Saint James" headquarters and were attended by himself, his Director, his Vice President, and consultants from McKinsey. According to FE 5, these leadership meetings were led by the Vice President of Logistics, who would provide an update as to where the logistics team was with its goals related to the Transformation Plan and where there were "gaps" in meeting those goals. FE 5 further recalled that various senior level employees would attend these leadership meetings and/or received documentation related to the progress of his division, and added that on occasion, Defendant Blanchard attended the leadership meetings that he attended. During the Class Period, FE 5 reported to Director Global Logistics and Distribution Rick Gonzalez.

39. **FE 6** worked for Weatherford at the Houston headquarters from 2014 until spring 2017. Specifically, FE 6 worked as a Manager within the Company's Tubular Running Services ("TRS"), which sold products to Weatherford's customers.

40. **FE 7** worked for Weatherford at the Houston headquarters prior to and during the Class Period. FE 7 was a leader in Corporate Accounting who ultimately reported to Defendant Mills. In Corporate Accounting, FE 7 managed 18 people, mostly internal and corporate accountants, as well as the group that handled the accounting for merging entities and a team in Switzerland. FE 7 also oversaw the corporate set of books, the accounting related to internal transactions along with statutory accounting. During his tenure, FE 7 met with Defendant Mills at least bi-weekly to give Defendant Mills updates and sometimes more often if there was something occurring, such as the elimination of a company or corporate entity.

41. **FE 8** worked for Weatherford at the Houston headquarters from October 2016 until September 2019. FE 8 worked as the Internal Controls Manager, overseeing supply chain logistics for the Manufacturing Division of the Company. FE 8 also oversaw supply chain manufacturing systems and processes, and ensured that manufacturing plants followed procedures, worked efficiently, and handled liaisons with customer companies. As part of his responsibilities, FE 8 interacted with the Controllers for all of Weatherford's manufacturing divisions. During the Class Period, FE 8 reported to Justin Walkup, the Global Engineering & Supply Chain Controller.

42. **FE 9** worked for Weatherford at the Houston headquarters from prior to the Class Period until July 2017 as a U.S. Business Unit Manager, Production Optimization Systems. As a U.S. Business Unit Manager, FE 9 was responsible for profits and losses for product lines within POI (Flow Measurement, Automation, Software, and Reservoir Monitoring). FE 9 provided data used in forecasts covering projected new business, investment, and personnel requirements. During his tenure, FE 9 reported to Jeffrey Juffali.

43. **FE 10** worked at Weatherford in its Wireline Division in various field offices in Texas and Oklahoma from March 2017 until November 2019. Specifically, for the first six months of his tenure at Weatherford, FE 10 was a Service Quality Champion. Then in September 2017, FE 10 moved to Oklahoma to be an Operations Manager. Finally, in February 2018, FE 10 became a Permian District Manager in the Permian Basin and was located at Weatherford's Odessa, Texas location. FE 10 oversaw wireline operations, which included jobs Weatherford took on analyzing wells in a region with active drilling sites in the Permian Basin, including West Texas and parts of New Mexico. FE 10 reported to the U.S. Wireline Manager Robert Born.

44. **FE 11** worked at Weatherford at the Houston headquarters from prior to the Class Period until June 2018. FE 11 started at Weatherford as U.S. Strategic Account Manager and was promoted in 2017 to Vice President of U.S. Sales. During the Class Period, FE 11 was responsible for overseeing the entire sales force that included approximately 400 employees.

45. **FE 12** worked at Weatherford at the Houston headquarters from October 2013 through December 2016 as a Business Intelligence Manager. FE 12's duties included accessing and managing Global Reporting Supply Chain orders through the JD Edwards finance software—which tracked certain of Weatherford's financials. FE 12's duties also involved developing and updating inventory reports and monitoring assets from a financial perspective. During his tenure, FE 12 reported to Kenneth Alexander.

46. **FE 13** worked at Weatherford at the Houston headquarters in its sales division for nearly 40 years, from 1977 until 2017. During his tenure, FE 13 held various positions in the Sales Division, primarily as an Account Manager in charge of Global Accounts with Weatherford's marketplace competitors. As a Global Account Manager, FE 13 was in charge of managing client accounts for major oilfield service companies that were also competitors. These companies would contract out jobs to Weatherford and in turn Weatherford would occasionally contract out jobs to them. FE 13 was responsible for coordinating the relationships between Weatherford and these key accounts. During his tenure, FE 13 reported to the Vice President of Account Management.

47. **FE 14** worked at Weatherford at the Houston headquarters for nearly 25 years, from 1994 until mid-January 2019. During his tenure, FE 14 worked as an executive assistant for various company executives and departments including CFO Lisa Rodriguez, and most

recently, Weatherford's President of Drilling and Evaluation, Etienne Roux from October 2017 to January 2019. FE 14 also had access to Weatherford's financial information.

48. **FE 15** worked at Weatherford at the Houston headquarters in the Investor Relations Department as a Market Research Analyst from August 2016 until February 2019. In that role, FE 15's responsibilities included assisting with market research and marketplace data over Weatherford's divisions, analyzing the competing oil and gas firms, and assisting with analysis for quarterly earnings reports. During the Class Period, FE 15 reported to the Vice President of Investor Relations, Karen David Green.

49. **McKinsey & Company – Restructuring & Transformation Services ("RTS")** is a global bankruptcy consulting company. During the Class Period, McKinsey & Company ("McKinsey") assisted Weatherford with the creation and implementation of the Company's Transformation Plan. RTS is a division of McKinsey, which, according to RTS's website, is a special unit of McKinsey that delivers a proven approach for transformational change to clients seeking radical, rapid, and sustainable performance improvement. RTS further specializes in corporate restructuring and distressed turnarounds.

## IV. SUBSTANTIVE ALLEGATIONS OF FRAUD[3]

### A. Prior to the Class Period, Weatherford Engaged in an Aggressive Acquisition Strategy that Caused the Company to Become Overleveraged and Caused Internal Personnel to Believe the Company Was No Longer a Going Concern

50. In 1998, a merger between Weatherford Enterra and Energy Ventures Inc. created the company known today as Weatherford International plc. As a result of that merger, Defendant Bernard Duroc-Danner became the newly-formed company's CEO. From the very beginning, Weatherford was determined to compete with the "big three" oilfield services

[3] Unless otherwise noted, all references to Weatherford's business and operations refer to events that occurred during the Class Period as defined herein.

companies: Schlumberger, Halliburton, and Baker Hughes. To do this, Weatherford believed that it had to rapidly expand its share of the market. Following this strategy, Weatherford acquired more than one hundred of its smaller oilfield service competitors. Between August 2008 and August 2011 alone, Weatherford acquired at least 10 significant oilfield companies including International Logging LLC, Secure Drilling, L.P., and the Oilfield Services Division of TNK-BP. As Defendant McCollum acknowledged in May 2018, "Weatherford is a collection of acquisitions over a long period of time."

51. Weatherford did not have sufficient cash resources to fund its buying strategy, however, and thus had to finance its acquisitions. In doing so, Weatherford incurred a massive amount of debt. By the start of the Class Period in the third quarter of 2016, Weatherford had accrued more than ***$7.1 billion in net debt, <u>more than twice</u> its then stock market value***.[4]

52. The multi-billion dollar debt was not the only issue resulting from Weatherford's rapid expansion plan. Weatherford failed properly to integrate the newly acquired businesses, and essentially had to run the hundred-plus acquisitions as separate businesses.

53. Not surprisingly, this failure resulted in massive inefficiencies that made it almost impossible for Weatherford accurately to account for its sales revenue, expenses, or tax liability. This problem was compounded by Weatherford's failure to hire enough accounting and finance professionals to help manage the rapid expansion. Indeed, in a 2013 interview, Defendant Duroc-Danner admitted that the Company did not add enough staff for accounting or corporate governance during its rapid expansion. As a result, the Company overstated its earnings by the shocking amount of $900 million for the years between 2007 and 2012.

---

[4] Weatherford defines "Net Debt" as debt less cash. *See* SEC Form 8-K, dated April 28, 2017.

54. A steep decline in oil prices in mid-2014 exacerbated these problems and led to the Company sustaining severe revenue declines and large losses ***for seven consecutive quarters***. Overall, the Company ***sustained more than $5 billion in losses from mid-2014 through the third quarter of 2016.***

55. These steep losses compounded the Company's debt problem, which by the third quarter of 2016 had ballooned to over $7.1 billion, and it became apparent within Weatherford that it would need to declare bankruptcy. Indeed, it was known internally that Weatherford was no longer a going concern[5] and that it was inevitable that the Company would need to declare bankruptcy. Based on the Company's sustained losses and growing debt, FE 7, a leader in Corporate Accounting, believed a going concern opinion should have been issued for Weatherford. Similarly, FE 5 was never in doubt that Weatherford would have to file bankruptcy and turning the Company around was "the impossible."

### B. Despite Its Financial Peril, Weatherford Falsely Assured Investors It Had Implemented a Plan to Lower Costs, Become Profitable, and Avoid Bankruptcy

56. Starting in October 2016, amid speculation and insider certainty of Weatherford's ultimate need to declare bankruptcy, Defendants nevertheless crafted a public story that they had implemented a plan that would completely overhaul the Company's business practices and make Weatherford profitable once again. Defendants also claimed that they cleaned up their troubling pre-Class Period practice of delaying ***or denying*** payment to Weatherford's vendors, and that the Company was now making all payments in the normal course. As set forth below, throughout the Class Period, Defendants repeated the false assurance that their Transformation Plan was

[5] The term "going concern" is an accounting term for a company that has the necessary resources to continue operating indefinitely until there is evidence to the contrary. Going concern also refers to a company's ability to generate enough revenue to stay afloat or avoid bankruptcy. *See infra* Section IV.C.6.

working, promising investors that Weatherford was hitting strict internal benchmarks on cost savings and profitability all along the way, and repeatedly denying any suggestion that bankruptcy was even a remote possibility for the Company.

57. These repeated assurances, however, were knowingly false. As detailed in Section IV.C, *infra*, fifteen former Weatherford employees, with first-hand knowledge of the Company's business practices and the supposed Transformation Plan, directly refute Defendants' statements. Indeed, the former employees strongly corroborate, *inter alia*, that (i) the Company continued its policy of delaying or denying payment to its vendors, a practice that did not actually cut costs and hurt the Company's ability to conduct business; (ii) the Transformation Plan was useless and had no chance of success and often hurt the Company's financial condition; and (iii) Defendants really had considered bankruptcy as a possibility all along.

58. For instance, as detailed below, although Defendants claimed unequivocally that they were "making normal payments to our vendors," ***eight*** former employees stated that during the Class Period, Weatherford continued its corporate practice of delaying or denying payment of vendor invoices to make it appear that its costs were lower than its real costs. The former employees recount how the practice was directed by Defendants McCollum and Bausch through company-wide emails, and how the situation worsened over time and caused Weatherford to lose business as critical suppliers refused to work with Weatherford.

59. Similarly, Defendants stated, *inter alia*, that they had "transformed the company" and had implemented "detailed, comprehensive, and clearly defined action plans" and that based on internal benchmarking, they had a "clear line of sight" to improving profits by $1 billion. But the accounts of ***ten*** former employees say otherwise. The plan of action was nothing more than a

cobbled-together collection of old, ineffectual initiatives and measures, often untested and contradictory, that did nothing effectively to lower costs or improve profitability.

60. Indeed, some measures, such as incentivizing sales personnel to book unprofitable work and cut critical staff, actually harmed the Company's bottom line. All of this was known to Defendants, as the former employees explained how the Individual Defendants had access to profit and loss statements showing that the measures did not work, and attended regular meetings where the Transformation Plan's shortfalls were discussed.

61. Moreover, Defendants' repeated denials, as fully set forth below, that "there [was] no existential liquidity issue," that bankruptcy was not even a "remote possibility," or that Defendant McCollum did not "waste a lot of time thinking or planning how to fail," all are undercut by former employee accounts explaining instead that ***bankruptcy was necessary*** and that Defendants did in fact ***discuss bankruptcy as an unavoidable certainty***.

62. Based on the Company's poor financial performance and debt load, by the start of the Class Period, a former Weatherford Corporate Accounting Leader raised serious questions as to whether Weatherford was a going concern and criticized the fact that a going concern opinion was never issued on Weatherford. Other former employees recount how they were aware that Weatherford's bankruptcy was unavoidable since 2016, and another recalled that in the middle of the Class Period, Defendant Fraser admitted that Weatherford was in fact preparing for bankruptcy and was meeting with bankruptcy attorneys, in direct contrast to Defendants' contemporaneous false denials otherwise. In sum, the public story spun by Defendants, as set forth below, that Weatherford presently was on the road to recovery and that bankruptcy was not a possibility, is ***directly contradicted*** by the Company's actual state of affairs during the Class Period.

### 1. Weatherford Claimed that It Had Implemented a Plan to Become Profitable and Was in "Recovery Mode"

63. On the first day of the Class Period, October 26, 2016, during the Company's third quarter earnings call ("3Q 2016 Earnings Call"), Defendants announced that Weatherford experienced its seventh consecutive losing quarter, this time to the staggering tune of, ***$5 billion***. Despite that dismal financial performance, and obviously desperate for a turnaround, Defendant Duroc-Danner announced to the market that the "[third quarter] marked the ***end of the decline*** for all regions," noting that "Weatherford is done" consistently running at a revenue deficit and was now, as they termed it, "in recovery mode."

64. On that same earnings call, Defendants outlined for investors several steps the Company had already taken and was planning on continuing to use to dig itself out of its massive debt. As part of Weatherford's recovery plan, Defendant Shivram announced various cost-cutting measures taken by the Company, which included across-the-board layoffs and closing of several manufacturing and operating facilities. Defendants promised investors that the initiatives would result in massive improvements in profitability and margins.

65. Aware that investors rightly considered the Company's past inability to pay vendors a telltale sign of severe financial distress, Defendants also created the misimpression that the recovery plan had corrected those prior issues. But, in direct contradiction to undisclosed, internal Company policies (as attested to by ***eight*** former employees), Defendant Shivram misleadingly reassured investors that Defendants "have been making ***normal payments to our vendors***, which in a sense is similar to ***paying down debt obligations***."

66. Moreover, Defendants claimed that improvements in profitability and margins would assuage concerns over Weatherford's massive indebtedness and potential bankruptcy. Specifically, during the 3Q 2016 Earnings Call, Defendant Duroc-Danner assured investors that

the "cuts in fixed costs are ***permanent and <u>sustainable</u>***," and Defendant Shivram explained that Weatherford "ha[d] ***enough liquidity*** to manage [the ***Company's] needs***," including its debt obligations. Likewise, Defendant Shivram touted to investors during that call that "there is ***no existential liquidity issue now for Weatherford***" and "there is no [] imminent threat or anything like that. So we will recover our liquidity position even stronger as we go through the next quarters."

67. As shown by consistent and positive financial analyst coverage, investors believed Defendants' turnaround story. For instance, on October 26, 2016, Credit Suisse issued a report maintaining its "Outperform" rating, explaining with respect to the prospect of the Company's future chances of bankruptcy that "[h]istory can repeat itself, but we don't see that as a real risk."

68. The next day, on October 27, 2016, RBC also issued a report that rated Weatherford as "Outperform" because of management's "[o]ptimistic tone." Specifically, the report cited Weatherford's "de-risking of the balance sheet" and RBC's "increased conviction in the turnaround story."

69. Similarly, Gabelli & Company issued a report that same day that continued to encourage investors to "Buy" shares of Weatherford, commenting that the "company removed near-term liquidity concerns" and that "[w]ith the amount of fixed-cost already removed, we believe that when drilling activity resumes, WFT maintains significant operating leverage which should enable it to easily generate free cash flow."

70. Furthermore also on October 27, 2016, UBS issued a report stating that Weatherford "meaningfully improved its liquidity position earlier this year . . . and management believes current liquidity levels are sufficient over the near-term."

71. Picking up on Defendant Shivram's demonstrably false claim during the 3Q 2016 Earnings Call that Weatherford was paying its vendors on time, Credit Suisse issued an analyst report on the same day rating Weatherford as "Outperform" and further noting that they were comforted by the fact that "[Weatherford] paid its vendors in better fashion."

#### 2. The Board Removed Defendant Duroc-Danner but the New Management Team Continued to Mislead the Public About Weatherford's Supposed Recovery

72. Just two weeks after the 3Q 2016 Earnings Call during which Defendants assured investors that Weatherford was in "recovery mode," the Company issued a press release on November 9, 2016 announcing the departure of Defendant Duroc-Danner as Chairman of the Board, President, and CEO. The November 9, 2016 press release further stated that Defendant Shivram would lead the Company as interim CEO, and would also continue as CFO until a new CFO was named.[6]

73. That same day, Defendant Duroc-Danner definitively told investors there was no chance that Defendants would not be able to deleverage the billions of dollars of debt on their balance sheet. Indeed, in an interview on that same day of his departure, Defendant Duroc-Danner asserted that, despite the Company's high indebtedness, he saw "***no remote possibility***" that the Company would not be able to manage its debt.

74. About a month later, on December 15, 2016, Weatherford issued a press release announcing the appointment of Defendant Bausch as EVP and CFO. According to the press release, Defendant Bausch reported directly to interim CEO Defendant Shivram.

75. As CFO, Defendant Bausch became heavily involved in Weatherford's ostensible recovery and transformation efforts. Indeed, Defendant Bausch stated that his top priority would

---

[6] Shortly thereafter, on November 16, 2016, Defendant Duroc-Danner was given the title of "Chairman Emeritus," where he served in an advisory role to the Board of Directors.

be personally to take on Weatherford's debt reduction: "As the new CFO of Weatherford my top priorities are: debt reduction, free cash flow generation, improving profitability, disciplined capital allocation and improved predictability going forward."

76. As the Class Period progressed, Defendants consistently told investors that the Company's recovery was underway and was effective in reducing the Company's debt. On February 2, 2017, during the fourth quarter 2016 earnings call ("4Q 2016 Earnings Call"), Defendant Shivram confidently told investors that "Weatherford is back" explaining, ***in direct contradiction to internally-known, but undisclosed Class Period facts alleged by former employees***, that "[w]e have just been through the most brutal down cycle in our industry's history and ***we have not only survived, we have transformed the Company internally and positioned it well for the multi-year up cycle that is just about beginning***."[7]

77. During the conference call, and underscoring the false claim that Defendants had already "transformed" Weatherford, Defendant Shivram told investors that debt reduction was the Company's top priority and that the cost-cutting measures were "eminently achievable" and would reduce the debt by more than 50% by 2021.

78. Analysts and investors continued to be misled by Defendants' positive statements. For example, after the 4Q 2016 Earnings Call on February 2, 2017, Guggenheim issued an analyst report stating that "[Weatherford] laid out a compelling vision to substantially de-lever the company['s debt] in the next four years."

---

[7] During the Class Period, Defendants took certain financial steps to give the appearance that their debt was manageable, but in reality they only amounted to delay tactics that only pushed off the inevitable reality that the Company was headed for bankruptcy. For instance, on the 4Q 2016 Earnings Call, Defendant Shivram informed investors that the Company extended its "debt maturities to 2019[.]" This step only delayed the inevitable and did nothing to alleviate the underlying fact that the Company was not profitable enough to service the massive debt it had incurred.

79. Additionally, Simmons & Company issued a February 2, 2017 report stating that the 4Q 2016 Earnings Call "presented a persuasive forward path for [Weatherford]," including "a persuasive deleveraging plan over the next four years." A SunTrust Robinson Humphrey ("SunTrust") report issued that same day also noted "[m]anagement laid out a reasonable plan to reduce debt and grow the company over the next 3 to 4 years," and maintained a "Buy" rating.

80. Likewise, UBS issued a report with a "Buy" rating that same day, explaining that "[Weatherford] laid out a strong and logical game plan for strengthening the company financially (cost cutting, reducing debt)."

81. Similarly, the next day, on February 3, 2017, Credit Suisse issued an "Outperform" rating and reported that "[Weatherford] laid out a very powerful blueprint for its future ambitions and goals, which were very well received by investors." Furthermore, Gabelli & Company issued a "Buy" rating the same day and opined that "we believe [Weatherford's] plan to deleverage is credible."

82. After only four months, on March 6, 2017, Defendant Shivram's run as interim CEO came to an end. On that day, Weatherford issued a press release announcing that the Board of Directors had appointed Defendant McCollum as President and CEO, and member of the Board of Directors, and was scheduled to begin his term as CEO in April 2017. Prior to coming to Weatherford, Defendant McCollum served as the EVP and CFO at one of Weatherford's biggest competitors, Halliburton. For the remainder of March 2017, the Company appointed Defendant Bausch as acting CEO until Defendant McCollum assumed the role in a permanent capacity in April 2017.

83. In connection with Defendant McCollum's role as President and CEO, his compensation included, in part, an annual base salary of $1 million, cash bonuses of 60%, 120%, and 180% of base salary, and a long-term equity incentive award of $6 million.

84. Despite Weatherford's change in management, it did nothing to reduce or manage its debt. In fact, Weatherford's net debt increased by $448 million during the first quarter of 2017, and then increased an additional $113 million during the second quarter of 2017, bringing the total all the way back to the pre-debt and equity offering amount of over $7 billion.

**3. Defendant McCollum Introduced His Formal Transformation Plan**

85. Recognizing that Weatherford's rising and uncontrollable debt likely was a fatal problem for Defendants, Defendant McCollum repeatedly explained that reducing Weatherford's debt was his top priority and further stated during the earnings call for the second quarter of 2017 on July 28, 2017 ("2Q 2017 Earnings Call") that he himself was holding "staff meetings at my level" to hold Weatherford's employees accountable for the transformation efforts.

86. Defendant McCollum further explained that "I've been on the road for about four or five, six weeks in and out visiting operations and things." Gabelli & Company issued a report on June 8, 2017, discussing a meeting that its analysts had with Defendant McCollum and Vice President of Investor Relations Karen David-Green, specifically noting that "Mr. McCollum's top focus and biggest priority is deleveraging the balance sheet."

87. Defendants needed to develop a plan of action for the public to rally behind and to generate investor support. Therefore, as part of Weatherford's transformation efforts, on July 28, 2017, during the 2Q 2017 Earnings Call, Defendant McCollum introduced a formalized plan (the "Transformation Plan"), which encompassed certain cost-cutting initiatives that supposedly were better and different than cost-cutting measures the Company took in the past. In truth, as described by numerous former employees, the Transformation Plan was ineffective and

concealed from investors the Company's inability to manage its debt and fast-approaching bankruptcy.

88. Underscoring their misleading claim that the Transformation Plan was effective, Defendants claimed it would be Weatherford's golden ticket to a healthy financial future. Thus, Defendants set financial targets that the Transformation Plan purportedly would allow the Company to meet, including cutting the Company's net debt and achieving breakeven free cash flow at a certain point.

89. For example, Defendant McCollum told investors during the 2Q 2017 Earnings Call that the Transformation Plan would "cut [Weatherford's] net debt in half by the end of 2019," aggressively accelerating the previous estimates given by his predecessor, Defendant Shivram. Additionally, in response to a Barclays Capital analyst's questions regarding Weatherford's debt paydown, cash burn, and "[h]ow [the public should] be thinking about free cash flow, like second half of 2017 and then maybe kind of beyond there," Defendant Bausch provided investors with a definitive target of when Weatherford would start generating profits instead of more losses: "[A]s we get into Q4 [of 2017], we'll work and we will be at breakeven."

90. Analysts again digested Defendants' statements about the Transformation Plan's and Weatherford's ability to achieve a significant reduction to the debt and the Company's 2019 breakeven date. On July 28, 2017, Credit Suisse issued an analyst report stating that Weatherford "gave encouraging commentary about the future and potential of [Weatherford]," and noted that "[n]et debt to be cut in half by mid-2019 is a bold statement, but one that management feels is achievable."

91. Moreover, the overall importance of the Transformation Plan and its ability to reduce the Company's debt was of critical importance to investors. As one J.P. Morgan report

issued on July 28, 2017 explained, "[i]nvestor focus remains on the company's plans for accelerated debt reduction and strategic realignment."

92. Weatherford's net debt, however, continued to rise during the third quarter of 2017 to approximately ***$7.5 billion***, a $370 million increase from the prior quarter.

93. Indeed, despite the ostensible progress that Defendants told investors the Transformation Plan was achieving, Defendants knew it was insufficient to dig Weatherford out of its debt. According to multiple Weatherford former employees, Defendants knew (or had access to) internal information concerning the Transformation Plan's inability to achieve the Company's targets.

#### 4. In The Face of Rising Debt, Defendants Announced Additional Measures to Control Costs

94. With this rising debt came yet more purported cost-cutting initiatives. During the November 1, 2017 third quarter investors call ("3Q 2017 Earnings Call"), Defendant McCollum announced further details about the Transformation Plan. Such efforts included reducing Weatherford's product and service offerings from eight product lines to only four focused business units: Drilling and Evaluation; Completions; Well Construction; and Production. Weatherford further announced that it would centralize all support functions, including supply chain and manufacturing.

95. Furthermore, Defendant McCollum clarified that the "changes [they're] making go far beyond headcount reductions" and that the changes would be "different this time." Indeed, the Transformation Plan included a workforce reduction, organization restructure, facility consolidations and other cost reduction measures and efficiency initiatives across the Company globally.

96. As part of the Transformation Plan, and in conjunction with consolidating the Company into only four focused business units, the Company announced that it intended to identify and divest business units which "are not critical to our strategy going forward" to streamline its operations and increase margins. To that end, Defendants explained that selling off parts of the Company (whether it be actual businesses such as the Fracking Division or large machinery such as certain drilling rigs) would help reduce the Company's massive debt.

97. Moreover, in addition to reiterating that they would meet the previously announced targets, Defendants decided to provide investors with a short-term target to demonstrate that the Transformation Plan's initiatives were in fact effective at reducing the Company's debt. To that end, during the 3Q 2017 Earnings Call, Defendant McCollum reiterated that such transformation efforts will achieve "$1 billion in profit improvements over the next 18 to 24 months."

98. However, instead of touting its prior target of reducing net debt by 50% by year end 2019, Defendant McCollum backtracked, instead stating that Weatherford's "goal is to cut our debt-to-EBITDA ratios by more than half by the end of 2019."

99. Defendant McCollum clarified that Weatherford would achieve these targets without needing to raise new equity: "[w]e are confident that our direction and our strategy will drive improved results" and "Weatherford [is] a classic turnaround story."

100. Notably, Weatherford's targets of profitability, cutting down its debt ratios, and reaching breakeven were not mere aspirations, but were based on Weatherford hitting its internal analyses and benchmarking. Indeed, during the November 1, 2017 3Q 2017 Earnings Call, Defendant McCollum unequivocally told investors that "***based on all the benchmarking and***

***internal analysis we have done***, we believe these targets can definitely be achieved. ***We know what we need to do***."

101. Analysts understandably anchored their expectations to Defendants' internal analyses and promises of profitability. For example, Wells Fargo issued a report on November 1, 2017, explaining that "with a solid turnaround story coming into focus and a path to deleveraging, we continue to highlight [Weatherford] as the best special situation stock in our OFS [Oilfield Services] universe with the potential for 50–75% upside." Cowen and Company issued an analyst report the next day and similarly opined that "[w]e continue to view [Weatherford] as a unique turnaround opportunity within OFS, as new leadership has performed a full scale business review and laid out initial plans to 'aggressively' drive change."

102. Despite analyst optimism, the Transformation Plan's purported success and progress that it was achieving was just smoke and mirrors, as former Weatherford employees confirm that the Transformation Plan's initiatives and selling off certain pieces of the Company's business were not working as Defendants touted. In fact, according to several former Weatherford employees, far from helping Weatherford climb out of bankruptcy, the Transformation Plan was failing to generate any profits and was driving Weatherford towards bankruptcy.

#### 5. Notwithstanding Known Failures, Defendants Continued to Tout the Transformation Plan and the Company's Viability

103. Despite the ineffectiveness of the Transformation Plan's initiatives and the litany of issues that Weatherford employees experienced while attempting to implement the Transformation Plan, Defendants continued to tout that the Transformation Plan was on track to generate the profits required to overcome the Company's debt issues and stave off bankruptcy.

104. With debt still ***over $7 billion***, Defendants knowingly concealed what several former employees have alleged—that during the Class Period, Defendants knew, or were reckless in not knowing, the plan was not working—and nevertheless carried on with the public narrative that the Transformation Plan was working, In a press release issued on February 2, 2018, which was attached to a Form 8-K signed by Defendant Bausch, Defendant McCollum was quoted, and continued to create the impression onto investors that Weatherford was on track to achieving its targets:

> In 2017, we set the stage for the future of Weatherford. ***We have made significant progress***, taking decisive and strategic actions throughout 2017. In addition to realigning and flattening our structure, ***we initiated an organizational [T]ransformation [P]lan*** that will create an estimated $1 billion in profit improvements over the next 18 to 24 months. Since announcing this plan last quarter, ***we have taken further steps as an organization to develop rigorous, detailed plans and validate our ability to meet this target***.

105. Defendants Bausch and McCollum similarly reaffirmed that they were on track to achieving their targets that same day during the earnings call for the fourth quarter of 2017 ("4Q 2017 Earnings Call"). In fact, as attested to by numerous former employees, internal reports and regular meetings showed that the Transformation Plan was not helping the Company achieve its targets and was actually making the situation worse.

106. Again, Defendants were not just optimistic about achieving these goals. Instead, on the 4Q 2017 Earnings Call, Defendant McCollum boldly stated:

> ***[W]e've put a project management organization and process in place to ensure*** that all of the collective profit improvement initiatives will be implemented on time and on target. Bottom line, ***we have a clear line of sight on the $1 billion transformation goal as well as a disciplined process in place designed to ensure that we can deliver.*** This is an undeniable, realistic and, most importantly, achievable opportunity.

107. Giving the impression that the measures instituted by the Transformation Plan were actually working, Defendants publicly doubled-down on their ability to reach their targets.

When asked by a Credit Suisse analyst during that same earnings call about Defendants achieving the $1 billion goal within 18 to 24 months, Defendant McCollum reassured the public that "as we go into 2019 I think the effects of the [transformation] program are going to start to be very, very demonstrable."

108. Analysts continued to act favorably towards Defendants' positive statements about the Transformation Plan's ability to reduce debt. For instance, immediately after the 4Q 2017 Earnings Call on February 2, 2018, RBC issued a report stating, "[w]e believe that [Weatherford] is on track to successfully execute its turnaround and [T]ransformation [P]lan." Similarly, SunTrust released a report that same day stating, "[w]e still expect WFT to de-lever, and report much stronger earnings and positive [free cash flow] in 2019, despite disappointing 4Q17 results, and reiterate our Buy rating."

109. Further, on February 4, 2018, Wells Fargo reported that it was maintaining its "Outperform" rating for Weatherford, basing its decision substantially on "the prospect of hitting management's restructuring targets (which is largely predicated on our faith in CEO Mark McCollum's ability to manage the turnaround)." Similarly, in a February 5, 2018 report, Credit Suisse expressed optimism about Weatherford's future by maintaining its "Outperform" rating of Weatherford and stating, "[t]he outlook is positive" and "[a]ll the right things are being done."

110. Defendant McCollum told investors he was so confident in the Transformation Plan that he would stake his career on it. Indeed, roughly two weeks after the 4Q 2017 Earnings Call, on February 13, 2018, Defendants participated on a conference call at the Credit Suisse Energy Summit, where Defendant McCollum again stated that "I'm confident that [the Transformation Plan] will enable us to deliver our objectives." Defendant McCollum then stated:

> We ***have a clear line of sight*** on the target as well as ***a disciplined process in place***, designed to ensure that we can deliver. This is an undeniable, it's a realistic, and most importantly, it's an achievable goal. ***I'm staking my career on that***.

111. Directly in response to Defendant McCollum's fabrications, a Credit Suisse analyst explained that "[t]his is the most positive presentation I think I've ever seen on the company called Weatherford. And having known your career in the business and you're staking it on it, we're going to keep our buy rating on the stock for now, just so you know."

112. As the Class Period progressed, Defendants continued confidently to promise investors that profitability and a lowering of debt was imminent. For example, on April 24, 2018, in addition to again touting that the "goals . . . set forth for 2018 and 2019 are realistic and achievable," Defendant McCollum explained that Weatherford was working on 1,600 initiatives and that there were 900 people across the Company who owned those initiatives and had teams working underneath them.

113. Analysts again reacted positively to this announcement. On April 25, 2018, Susquehanna Financial Group, LLLP ("Susquehanna") reported that the upgrades "reflect an improved outlook for [Weatherford's] ability to achieve earnings improvement through its transformation process." Wells Fargo also had a positive opinion of Weatherford's status stating that "we believe management has 'steadied the ship' and has the organization moving solidly in the right direction."

114. During this time, Defendant McCollum admitted that he worked hand-in-hand with McKinsey and therefore kept up-to-date with the Transformation Plan's progress during the Class Period. Specifically, Weatherford participated in a Global Oil and Gas Conference on May 22, 2018 hosted by UBS.

115. During this conference, in addition to again providing investors with (falsely) glowing reports of the Transformation Plan's progress, Defendant McCollum explained that Weatherford "engaged RTS, an arm of McKinsey who's helping us—[they] come alongside us and are putting experts alongside each one of the work strains." Defendant McCollum also informed investors that he "got procurement experts, sales experts, manufacturing experts who were sitting with our team to not only coach them but to help give me feedback."

116. In other words, Defendant McCollum was not merely managing the Transformation Plan at a high level; instead, Defendant McCollum was made aware of the Transformation Plan's specific progress by individuals charged with implementing the initiatives. But Weatherford's former employees in charge of monitoring the Transformation Plan's progress have stated that the Transformation Plan was never properly vetted nor did it improve the Company's financial condition.

117. On June 4, 2018, Susquehanna released a mid-quarter report on Weatherford, expressing positive predictions for the Company's future, as well as stating that "[w]e are encouraged by WFT's confidence in its plan and are now giving the company more credit for the transformation than we had been previously." The next day, RBC released a report that explained that the "[C]ompany is still on track in terms of dollar and timing of its $1 [billion] [T]ransformation [P]lan."

118. When faced with the occasional question concerning Weatherford's targets in light of its massive debt load, however, Defendants stuck to their misleading story. For instance, Q Investments, L.P. ("Q Investments"), a Texas-based hedge fund and activist investor in Weatherford, drafted and sent a letter to Weatherford's Board of Directors on June 21, 2018. The letter's purpose was to ask the Board to consider "alternatives if Weatherford's planned $1

billion improvement in operating results becomes another broken promise." The activist investor expressed concerns over Weatherford having "too much leverage" and "whatever incremental positive internal steps the Company can take will not solve the issue."

119. Yet, on July 27, 2018, notwithstanding the concerns expressed in the activist investor's letter and despite the fact that Defendant Bausch either knew or was reckless in not knowing that the Transformation Plan's initiatives were a far cry from achieving its desired results, during the second quarter of 2018 earnings call ("2Q 2018 Earnings Call"), Defendant Bausch doubled-down on the purported success of the Transformation Plan to date, explaining that "[f]or the full year 2018, we reiterate our expectation of breakeven cash flow" and that "EBITDA increases will be driven by our transformation initiatives and market growth."

120. Similarly reassuring investors that the Transformation Plan would "provid[e] a path to reduce overall debt," Defendant McCollum reiterated that Weatherford "remain[ed] committed" to and he is "confident" of achieving Weatherford's targets, and further explained ***"we have already made considerable progress toward our ultimate goals***."

121. Investors understood Defendants' statements to mean that the Transformation Plan was working. For instance, continuing to believe the Transformation Plan was on track, analyst Raymond James reported that "[m]anagement reiterated its confidence in executing its transformation program and recommitted to the target of $1 [billion] annual EBITDA benefit by 2019."

122. Additionally, in its July 27, 2018, analyst report, Evercore reaffirmed its optimism regarding Weatherford's ability to meet its transformation targets by finding that the "Transformation [was] [t]rending in the [r]ight [d]irection," and stating, "Weatherford continues to make tangible and material progress on its Transformation program as CEO Mark

McCollum's strategic vision starts to crystalize." Indeed, the Evercore report further believed "that 'transformation' isn't just a buzzword for Weatherford (despite the fact that the word was spoken 34 times during the conference call). Weatherford's 'transformation team' is reportedly working towards completing some 1,600 individual initiatives, which speaks to the magnitude of processes McCollum has already identified to help turn around the [C]ompany."

123. Similarly, in its July 29, 2018 report, Wells Fargo expressed the same sentiment, stating that "[o]verall, we believe management continues to execute on (critical) 'transformation' initiatives, is close to completing multiple asset sales, and the prospects of [free cash flows] in [second half of 2018] and 2019 look increasingly likely."

124. Defendants continued to make statements touting the success of the Transformation Plan throughout the Class Period. On September 5, 2018, at the Barclays Energy Power CEO Conference, Defendant McCollum told investors, "I can confidently stand before you and say that this word [transformation] has come to life for us," and reassured investors that Defendants made "***impressive***" and "***material progress***" in their "***transformation, which is <u>on target and driving us forward</u> on our journey to sustainable profitability***."

125. Defendants' positive words about achieving their targets continued to encourage analysts. For example, on September 19, 2018, G.research LLC of Gabelli Securities issued a report that "the restructuring program is on track, if not ahead of schedule."

### C. Fifteen Former Weatherford Employees Contradict Defendants' Class Period Statements Concerning Weatherford's Transformation Plan and Ability to Avoid Bankruptcy

126. ***Fifteen*** former Weatherford employees have provided allegations directly contradicting the numerous false assurances Defendants made to the market that the Transformation Plan was implemented and working, and the Company was on track to achieve

profitability. These witnesses had firsthand knowledge of the events to which they testified, as well as direct access to management and Defendants.

127. Most importantly, these fifteen former employees' allegations are highly corroborative, all relating ***the same facts***, notably that (i) Weatherford was not financially stable and could not pay its vendors on time; (ii) the Transformation Plan was never going to work and actually harmed the Company's financial position; (iii) high-ranking employees internally expressed major concerns about Weatherford as a going concern; and (iv) Defendants internally discussed bankruptcy as a real possibility.

### 1. Weatherford's Supposed Cost Savings Measures Consisted of a Corporate Policy to Avoid Paying Its Vendors, an Accounting Trick to Temporarily Boost Its Cash Flow

128. Weatherford's growing debt forced Defendants intentionally to delay payments to their vendors and contractors—or simply not to pay them at all—just to stay financially afloat and avoid bankruptcy.

129. Prior to the Class Period, investors learned, through the Company's required public filings, of this troubling practice.[8] Therefore, Weatherford's public recovery story included an assurance that the practice had stopped and that Weatherford was now paying vendors in the normal course. However, numerous former Weatherford employees recalled that contrary to Defendants' statements implying that Weatherford was financially stable and paying its vendors on time, the Company in fact was not timely paying its vendors during the Class Period.

[8] For instance, on a February 4, 2016 earnings call announcing results for the fourth quarter of 2015, Defendants revealed significant cost increases as a result of making payments to "vendors that had been delayed for several quarters."

130. According to FE 6, the Company was ***not*** paying its vendors and in fact had ***systemically delayed*** paying its vendors from as far back as the first quarter in 2016. Specifically, FE 6 stated, that it was part of Weatherford's recovery plan to "screw over" every vendor that the Company had done business with.

131. Likewise, FE 9 also confirmed that Weatherford's payment delays to its vendors were happening prior to and during the Class Period, including within his own business unit. FE 3 likewise recalled that one of the ways that Weatherford attempted to save money in the short term was to delay vendor payments. Similarly, FE 12 explained that from the beginning of his employment with Weatherford in October 2013, through his tenure that ended in December 2016, Weatherford was known to be a slow-payer; it did not pay its bills.

132. FE 13 and FE 14 further corroborated that delayed payments to vendors began before the Class Period. Likewise, FE 5 further explained that Weatherford would delay payments to any and all vendors, and would hold payments as long as it could. Indeed, FE 14 explained that Weatherford's decision to extend its payment terms to vendors was unilateral, and FE 14 described Weatherford's situation prior to and during the Class Period as "robbing Peter to pay Paul," in terms of struggling in finding ways to pay vendors.

133. Similarly, FE 9, FE 3, FE 14, and FE 10 explained that throughout the Class Period, Weatherford continually extended its payment terms with its vendors from Net 60, to Net 90, to Net 120, to Net 180 days, effectively pushing out the payments for multiple quarters. In other words, if an invoice with a vendor instructed the payment term as "Net 60," the "60" refers to the number of days after the invoice is dated that payment is due. Thus, during the Class Period, Weatherford unilaterally extended the amount of time that it had to pay its vendors, eventually extending it several quarters.

134. Critically, former employees confirm that Weatherford intentionally delayed its vendor payments for the purpose of misleading investors into thinking the Company's financials were better than they actually were because it allowed the Company to keep more cash and accounts payable on the books. For example, FE 3 explained that the ***delayed payments were simply an accounting trick to try and hope that next month is better than this month***. FE 3 also recalled that the payment delays were an intentional practice that "went all the way up" to the top of the Company.

135. Specifically, FE 3 confirmed that Defendant McCollum and Defendant Bausch sent out company-wide emails about the new policies to delay payments to Weatherford's vendors. Additionally, FE 14 explained that he believed Weatherford's quarterly statements were unreliable because at the end of every quarter, large bills were not paid so that the Company's cash flow looked better. Indeed, as FE 5 explained, the reason for the delays in payments to vendors was because Weatherford was wounded and bleeding, referring to its financial status and that it was directly related to Weatherford's lack of cash flow.

136. Moreover, in addition to consistently delaying payments to its vendors, Weatherford sought also to slash its supplier costs, notwithstanding the negative repercussions that resulted from doing so. For instance, according to internal Weatherford documents obtained by Lead Counsel, at the end of 2015, Weatherford sent its employees a letter entitled, "Supplier Blitz II Overview and Guide," which explained that "Weatherford will send suppliers a letter with three choices."

137. The letter indicated that suppliers could either: (1) offer Weatherford "a [d]iscount of 10% effective Oct[ober] 1[st] on new [purchase orders]"; (2) provide a "[o]netime rebate on YTD spend of 5.25% from [January to August 2015]"; or (3) they could

"[r]enegotiate[] price schedules, with discounts in excess of 10%." Despite these drastic, undisclosed practices, Weatherford's financial health continued to suffer. Accordingly, as Weatherford's financial condition got only worse as the Class Period progressed, Defendants had no choice but to increase the discount they sought from suppliers and vendors over and above the figures stated in the 2015 letter.

138. For example, FE 6 explained that in the summer of 2016, his U.S. Operations team launched a program, to which he referred as a "Global Initiative," to cut vendor costs by 20% across the board. FE 6 explained that Weatherford would request 20% discounts from its vendors and then not pay them on time. FE 6 explained that this Global Initiative was launched by Davy Davidson, Weatherford's former Vice President of Manufacturing & Global Supply Chain.

139. FE 9 confirmed that Weatherford demanded discounts from 15 to 20% from its vendors. Finally, around this time FE 3 recalled that a procurement group went to all 2,000 of their vendors asking for discounts.

140. FE 14 explained that in 2017, the Company attempted to receive a 10 percent cut on invoices from all important vendors. FE 14 recalled that in 2017, the Company sent out notes to vendors stating that, going forward, Weatherford was going to pay them 90% of the value of the charges in their invoices.

141. Naturally, Weatherford's vendors ultimately refused to work with Weatherford because of the risks and unlikelihood of receiving full payment. FE 9 recalled that the vendors did not want continuously to extend their payment terms. FE 9 explained that many vendors started looking elsewhere because of these issues. FE 12 recalled that contractors working for

him routinely complained that they were not getting paid. Specifically, FE 12 recounted that British Petroleum ("BP") was one of his clients and it was not getting paid in a timely fashion.

142. Other former Weatherford employees confirmed that the Company's practice of not paying vendors or suppliers was impacting both Weatherford's business and client relationships. Specifically, FE 13 confirmed the serious problems relating to Weatherford's vendors. FE 6 recalled that these delayed payments to Weatherford's vendors caused those vendors to refuse to ship products which, in turn, caused the Company to lose business in certain cases.

143. FE 14 corroborated that vendors started refusing to work with Weatherford and the jobs were not able to be completed. FE 14 explained that nobody at Weatherford was doing anything other than treading water, and that he and his fellow Weatherford employees were not able to buy anything from vendors because Weatherford refused to pay them. Similarly, FE 10 explained that Weatherford's systematic failure to pay its vendors got so bad that vendors did not want to work with Weatherford and the ones that did "price gouged" them.

144. Likewise, FE 3 stated that during the Class Period Weatherford was losing all of its vendors. FE 3 confirmed that the payment delays got so bad that both small vendors and the major vendors, including Kenworth, Peterbuilt, and Granger, stopped working with Weatherford. FE 3 further stated that the delayed payments got to be such a problem that the Company had trouble getting its vehicles and equipment services. FE 3 recalled a particular example where a vendor repairing a truck in Midland/Odessa held the truck hostage because the vendor had not been paid for work done on another division's truck. FE 3 was extremely frustrated by this because the delays in payments impacted Weatherford's ability to get supplies, which ultimately

hurt Weatherford's ability to generate revenue. FE 3 concluded that Weatherford was just kicking the can down the road by not paying its vendors.

145. According to other former Weatherford employees, Weatherford's inability and refusal to pay its vendors continued to harm the Company throughout the Class Period. For example, FE 10 explained that few vendors wanted to work with Weatherford after the payment terms became known. FE 10 recalled that he had to hunt vendors down just to get a job done, and then they would charge Weatherford ***double the normal price***.

146. FE 5 remembered an occurrence during his tenure (a time encompassed by the Class Period) when Weatherford persisted in delaying payments to Federal Express, who FE 5 relied on heavily for freight. FE 5 recalled that these payment issues with respect to Federal Express began to impact his work, but the Company showed no urgency to remedy the issues.

147. The adverse effects of not paying vendors got worse later in the Class Period as well. FE 14 explained, for instance, that by 2018, payments to vendors were so bad that he spent nearly all his time talking to vendors who needed payment. FE 14 stated that he told the vendors he would look into it, but there was no issue to look into. FE 14 recalled that, he and colleagues were directed by email to not tell vendors what was actually occurring, in terms of Weatherford's difficulty in making payments to vendors, nor to forward that email to vendors.

148. FE 14 further recalled that, to be able to pay vendors, he had to submit vendor payment forms every Monday, because every vendor payment "had to be approved by the C-suite." FE 14 also stated that the only regular, on-time payments Weatherford made were mainly to utilities and payrolls; the Company ***always*** forced non-utility vendors to wait an extended period of time. Corroborating FE 14, FE 1 recalled that by mid-2018, Weatherford did not pay most of its vendors unless they called to complain.

149. FE 5 explained that the decision to delay payments to the Company's vendors was "permeating from above," and the order to delay payments to vendors like Federal Express was systemic. Similarly, Defendants McCollum and Bausch knew about the vendor payment delays because, according to FE 3, the payment delays were an intentional practice that went to the very top of the Company, with CEO McCollum and CFO Bausch sending out company-wide emails about the new policies to delay payments.

150. In further support of the fact that Weatherford's financial condition was deteriorating, despite the ***purported*** significant progress Defendants claimed they were making at achieving their cost-cutting goals, Weatherford was unable to pay for the very basic items found in every office.

151. For example, FE 14, who was as an assistant to Weatherford executives, explained that Weatherford had no money and was not paying its bills. Instead, FE 14 stated that Weatherford paid its employees and to keep the electricity on, but that was it. For instance, during 2018, FE 14 recounted that the Company stopped purchasing office supplies and had already stopped buying paper cups. FE 14 recalled that during meetings, he had no way to give visitors a cup to serve water in, and that when they ran out of basic office supplies, he would have to search the building for extras from other departments or get approval from the Company president to purchase new supplies. FE 14 explained that the Transformation Plan was only a smokescreen, something Weatherford showed shareholders to make it seem as if it was making an effort. FE 14 further stated that Weatherford would definitely not survive.

152. The fact that Defendants were consistently unable to pay the Company's bills (or if they could, they were late), as corroborated by numerous former Weatherford employees, adversely affected the Company's ability to conduct business and hurt Weatherford's revenue

stream. In light of the harm incurred from not paying their bills, coupled with the fact that the Transformation Plan was inadequate to provide the Company with enough revenue to combat its massive debt, Defendants used non-vendor payments to manipulate the Company's financial statements.

153. Indeed, a former Weatherford employee explained that Defendants had played fast and loose with their financial statements to appear that they were financially better off than they actually were. Specifically, FE 3 recalled a particular example in November or December of 2018, when Weatherford did not pay any bills in November or December, so the Company would appear to turn a profit. Indeed, he looked at internal profit and loss statements and noticed that Weatherford's costs went drastically down and then went drastically back up.

**2. Defendants Knew the Transformation Plan Was Insufficient and Would Not Reduce Weatherford's Debt**

154. Despite the progress that Defendants ***told investors*** that the Transformation Plan was achieving, Defendants knew all along that the Transformation Plan was insufficient to dig Weatherford out of its debt. According to multiple former Weatherford employees, Defendants knew about, and had access to information concerning, the Transformation Plan's inability to achieve the Company's targets. For example, Defendants received or had access to adverse, internal information, such as the profit and loss statements, that illustrated Weatherford's deteriorating financial condition and lack of effectiveness of the Company's cost-cutting measures.

155. Indeed, FE 3 recalled that the Company's management had access to monthly profit and loss statements, which were tracked on the Company's internal JDE (JD Edwards System), which FE 3 checked regularly. FE 3 further explained that it was clear from his reviews of the profit and loss statements that Weatherford was delaying the inevitable

bankruptcy. FE 3 also recalled that the profit and loss statements for the Wireline Division indicated that it was consistently losing money. FE 3 added that when he sat in on U.S. calls with other divisions, he learned that other divisions were losing money as well, specifically recalling that the Drilling Division was losing money.

156. The Company also held various Transformation Team meetings where the Transformation Plan's progress was tracked and discussed. For example, according to FE 3, there were biweekly Transformation Plan meetings. FE 3 explained that he was brought into those meetings to update McKinsey consultants on the progress of the Transformation Plan.

157. FE 3 alleges that his division was losing money, so he was asked to provide updates on how it was meeting goals. FE 3 added that he knew that other groups within Weatherford were having similar discussions with McKinsey. Other former employees corroborate that progress was tracked at regularly held meetings. FE 8 similarly recalled that employees on the Transformation Team attended weekly transformation meetings, where progress was tracked, and reported back.

158. FE 5 also recounted that as part of the Transformation Team, during his tenure at Weatherford, he attended (sometimes weekly or at a minimum bi-weekly) leadership meetings to discuss the Transformation Plan as it related to the Company's Global Logistics team. FE 5 recalled that these leadership meetings were held in the mornings at the Company's "Saint James" headquarters and attended by himself, his Director, his Vice President, and McKinsey.

159. According to FE 5, these leadership meetings were led by the Vice President of Logistics, who would provide an update as to where the logistics team was with its goals related to the Transformation Plan and where there were "gaps" in meeting those goals. FE 5 further recalled that various senior level people attended these leadership meetings and received

documentation related to the progress of his division, and added that on occasion Defendant Blanchard attended the leadership meetings. FE 5 further stated that the C-suite "absolutely" kept track of the Transformation Plan's progress.

160. At these meetings between the divisions and McKinsey, everyone who attended knew (or was reckless in not knowing) that the Transformation Plan's initiatives were not working. For example, FE 3 recalled that when he first started to attend these meetings with McKinsey, he would inform McKinsey about issues regarding cost-cutting measures not working. FE 3 also explained that when other divisions met with McKinsey, they also told McKinsey that there was no way to get past Weatherford's insurmountable debt.

161. However, FE 3 explained that it became a point where if anyone went against the Transformation Plan, "you were moved out." FE 3 also explained that from those meetings with McKinsey, it was obvious that they were not making the "proper changes" to make a material impact that would help Weatherford pay down its $7.5 billion in debt. FE 3 recalled that at one point there were even questions amongst FE 3 and colleagues around the office about whether Weatherford was making enough money to make payroll.

162. In addition to the Transformation Team meetings with McKinsey, Defendants stayed apprised of the then-financial condition of the Company throughout the Class Period. FE 8 further recounted that the Company held quarterly meetings that were "all hands-on deck" led by Defendant McCollum where financial results would be highlighted.

163. Moreover, Defendant Blanchard was well aware of the issues surrounding the Transformation Plan's effectiveness. FE 1 in fact recalled that he personally raised questions to Lance Marklinger, FE 1's boss, John Wilson, who FE 13 explained was in charge of the

Transformation Plan, and Defendant Blanchard about the Transformation Plan's likelihood of success.

### 3. The Transformation Plan Was at Best Ineffectual and at Worst Detrimental to Weatherford's Financial Condition

164. Contrary to Defendants' confident, ***public*** claims about the Transformation Plan's success, several former Weatherford employees who worked on the Transformation Plan stated that the Transformation Plan was ineffectual and actually detrimental to Weatherford's recovery efforts. Indeed, as corroborated by numerous former Weatherford employees, the Transformation Plan was a complete and utter failure.

165. FE 4 explained that despite McKinsey being hired to help, the Transformation Plan was not 100 percent planned, was not well-executed, and did not make the impact intended. Specifically, the Transformation Plan initiatives that McKinsey supposedly helped develop were nothing more than a compilation of Weatherford's employees' own various suggestions to McKinsey.

166. For example, FE 3 alleges that McKinsey simply surveyed employees about ways to save money, put that information into spreadsheets, and regurgitated their responses to senior leadership. FE 4 corroborated that Weatherford's Transformation Plan was developed by McKinsey soliciting suggestions from every department for ways Weatherford could either cut costs or increase revenue. Likewise, FE 1 also explained that the Company's Transformation Plan involved employees being asked to come up with ideas to generate revenue or become more efficient.

167. Furthermore, many of the Transformation Plan's initiatives consisted of efforts that Weatherford employees were already doing, and therefore, the so-called Transformation Plan was not "transforming" anything, as it did not change what Weatherford employees were

already doing day-to-day. FE 3 confirmed that it consisted mainly of initiatives in which the Company was already engaged. FE 3 recalled that McKinsey produced a video showing field workers how to wash, clean, and organize their trucks to save time and money. But FE 3 explained that those were things already being done.

168. Similarly, FE 1 recalled that the initiatives that were included in the Transformation Plan—closing locations, selling off inventory, attempting to raise prices—were really "just doing business as usual."

169. Likewise, FE 10 confirmed that some of the initiatives on the Transformation Plan that were touted already existed. For example, FE 10 recalled that Defendant McCollum talked on one earnings call about a transformation initiative to create a "knowledge sharing" forum where workers at the Company's various locations could submit lessons learned and get feedback. FE 10 explained that after that announcement, he and others within the Wireline Division were confused because they already had that "knowledge sharing" forum, and were using it every day.

170. FE 10 also stated that the system they used was called WISE Group, and part of the "WISE" acronym stood for "Weatherford Intelligence Sharing." FE 10 explained that Weatherford had engineers in Houston and an entire department in England and "all they d[id wa]s operate the WISE Group." FE 10 further explained that anyone within Weatherford could call the WISE Group up or submit questions and that it was something the Company had for 10 years.

171. Notably, as FE 4 and FE 11 explained, the Transformation Plan consisted of over 1,500 different initiatives, which contributed to Transformation Plan's demise. To be sure, multiple former employees explained that those more than 1,500 initiatives were rushed, not

vetted for effectiveness, and not given any prioritization. FE 4 recalled that the entire process of developing the Transformation Plan initiatives was completed in about two months, which FE 4 considered to be very fast, with no time to strategize, vet ideas for effectiveness, or plan implementation phases.

172. For example, FE 4 explained that if someone proposed an idea that they claimed would save $5 million, the validity of that claim was not checked for accuracy. FE 4 further stated that implementing the Transformation Plan—*i.e.*, the over 1,500 separate initiatives—became very complex since there were competing priorities and there did not seem to be any prioritization.

173. FE 4 further explained that carrying out the over 1,500 initiatives was unorganized and lacked direction, and as someone in charge of change management, he said he felt an intense internal struggle because he saw no direction and attempted to voice objections and question the method of the Transformation Plan in team meetings, but FE 4 recalled that responses did not seem to address his concerns and instead focused on carrying out as many changes as possible.

174. Moreover, the Transformation Plan's cost-cutting measures often times harmed—not helped—the Company. For example, FE 3 recalled one cost-cutting change in his division that created major operational problems. Specifically, FE 3 explained that the Company kept cutting certain positions, to the point that those who were still employed were overworked. Indeed, service orders and job tickets could not keep up with demand. FE 3 recounted that the Company leadership promised plans for a computer system that would remove the need for as many administrative assistants, but that did not happen. FE 3 explained that there was no one to input service orders or job tickets or pay bills, and so there was a general lack of coordination in

field offices. FE 3 recounted that an example of the negative impact of fewer administrative employees was an increased status of Days-to-Invoice ("DTI"). FE 3 explained that DTI was the amount of days it took to invoice for a job, and that the "DTI went up."

175. Similarly, FE 1 recalled that some initiatives were not based on sound business practices and still created losses for the Company. For example, FE 1 explained that the Transformation Plan included selling off equipment, including pumping units and pump jacks, at prices well below cost for items they had built sometimes as little as a year before.

176. In addition to the Transformation Plan's initiatives themselves being ineffective and inadequate to solve Weatherford's debt problem, the Transformation Plan also shifted too much power to the Sales Division, creating unintended negative consequences for Weatherford because it removed the salespersons' accountability to other departments, allowing salespersons to sell products and services at lower costs to be compensated for the simple fact of making the sale and generating cash flow, whether or not the Company made a profit on the sale. This escalated to a point where Weatherford would either breakeven or actually incur a loss on most sales.

177. FE 3 confirmed that one of the reasons the Company continued to lose money was Weatherford's shift of power to the Sales Division. He explained, for example, that salespersons would, against objections from the Operations Division, quote a job for a client at $100,000 but it would cost $120,000 to operate the job. FE 3 stated salespersons would receive their bonuses for generating cash flow, but the Company lost money on the work.

178. FE 10 corroborated that the Transformation Plan gave salespersons more power and switched the Company to an account manager system. FE 10 explained that this power shift created a situation where the Sales Division was no longer accountable to the Operations

Division when it came to price. FE 10 explained that this led to salespersons offering clients services that may cost the Company $20,000 to complete but only charging $15,000.

179. FE 10 stated that the problems were reported to Mark Swift, Weatherford's President of the Western Hemisphere. According to FE 3, Swift reported to Defendant McCollum, sat on the 12th floor with Defendant McCollum, and attended high level meetings with Defendant McCollum at least quarterly. FE 3 also explained that the whole C-suite was on the 12th floor.

#### 4. Weatherford's Cost-Cutting Initiatives Were a Drop in the Bucket Compared to the Over $7 Billion of Debt

180. Furthermore, former Weatherford employees recalled that Defendants' cost-cutting measures dating back as far as 2016 were not able to prevent Weatherford from filing for bankruptcy protection. Indeed, multiple former Weatherford employees corroborated that there was no way the Transformation Plan was an adequate match against Weatherford's billions of dollars of debt because the cost-cutting measures were merely a drop in the bucket.

181. FE 7 stated that the Company had billions in debt and he saw no way for Weatherford to get out of it. For instance, FE 7 explained that the Company's spin-offs yielded a couple hundred million here and there, which was nothing compared to the billions Weatherford had in debt.

182. FE 5, who also was on the Transformation Team and attended leadership meetings to discuss the Transformation Plan's progress, explained that part of the Transformation Plan was to sell parts of Weatherford's businesses to generate additional cash but in reality it was not enough to salvage what he described as a sinking ship. In fact, FE 5 described Weatherford's situation the following way: It was like being on the Titanic and taking a bucket of water and throwing it overboard to save the ship. FE 5 explained that the specific

businesses or assets that Weatherford was selling as part of its Transformation Plan were "small components" that were overall immaterial to the rising debt, but it allowed Weatherford to mask its debt pressures by showing investors that it was making attempts at paying its debts. However, according to FE 5, it was clear from the leadership meetings that he attended that these efforts were a drop in the bucket.

183. Moreover, many of the Transformation Plan's initiatives were not even realistically achievable. For example, FE 5 recounted how when he first joined Weatherford and was presented with the Global Logistics team's numbers that he had to achieve, he knew they were "asinine," and that there was no way to meet those numbers. FE 5 described it as a person who makes $100,000 per year attempting to pay off a million dollar loan in one year. FE 5 further analogized, and explained that it was like every month a person pays less than the minimum on their credit card bill and they continue to dig their hole with increasing interest payments that were insurmountable. FE 5 further stated that the amount of savings that they projected for the Transformation Plan did not correlate with the spend. Unfortunately, according to FE 5, Weatherford had a culture where it was frowned upon to speak up or identify questionable numbers. He described it as a culture to "not speak."

184. Similarly, FE 2, who was a member of the Transformation Team and responsible for working with teams to establish a 20% daily rate increase on labor rates, environmental charges, and a "vast array of things," recalled that the market would not support the rate increase and the efforts to ask for the higher rate "fizzled out" within three months of him taking on that role, in about July 2018. Specifically, FE 2 met with product line directors and the VP of Operations to make sure they were implementing price increases. These were usually discussed via conference call that varied in frequency from weekly to monthly. FE 2 then explained that he

audited those worker's tickets to get proof that they were charging the higher prices. But FE 2 recalled that for the most part they did not implement the price increases because the market could not support it.

### 5. Bankruptcy Was Internally Discussed as a Likely Option Throughout the Class Period

185. As several former Weatherford employees confirmed, at the time these statements were made, bankruptcy was already very likely. For example, FE 1, who was the Vice President of Account Management and supervised about 25 sales vice presidents and directors, recounted many frank conversations he had with Defendant Fraser during the Class Period about the Company's financial problems. Defendant Fraser, as Chief Accounting Officer, reported directly to Defendant Bausch, which provided Defendant Fraser with further knowledge about the Company's true financial situation and what Defendant Bausch knew at the time.

186. Defendant Fraser worked on the 12th floor[9] with Defendant Bausch. FE 1 explained that Defendant Fraser would come into FE 1's office, shaking his head in disbelief at the Company's financial problems. FE 1 and Defendant Fraser discussed what to do about various client accounts, oil prices, and the money the Company was borrowing at high interest rates to pay the interest payments on their debt. FE 1 recalled that from these discussions with Defendant Fraser, FE 1 determined that Weatherford was just kicking the can down the road and procrastinating to file for bankruptcy.

187. FE 1 recalled another specific instance when Defendant Fraser was in FE 1's office in the second quarter of 2018. At that time, Defendant Fraser explicitly informed FE 1 that the Company was seriously preparing for bankruptcy, and indicated that bankruptcy was

---

[9] Per publicly available documents, Defendants Fraser and Bausch worked on the 12th floor of Weatherford's Houston location, located at 2000 Saint James Place, Houston, TX 77056.

imminent. FE 1 further recalled that Defendant Fraser informed him that Weatherford was meeting with attorneys about bankruptcy by the third quarter of 2018. FE 4 also confirmed that the possibility of bankruptcy had been known at the Company since 2016.

188. FE 6 stated that Weatherford "flat out lied" when they claimed the Transformation Plan was going well and that it was a general feeling amongst all of the managers there that bankruptcy was inevitable.

189. FE 3 explained that he and his former colleagues with many years of experience in the industry and at Weatherford knew that the Company was "doomed," regardless of Defendant McCollum's statements.

#### 6. A Corporate Accounting Leader at Weatherford Explained that a Going Concern Opinion Should Have Been Issued as Far Back as 2016

190. As a result of the Company's abysmal financial performance, massive debt load and catastrophic failure of the Transformation Plan, one former Weatherford employee, who worked in various high-level accounting roles at Weatherford, explained that Weatherford should never have been able to continue as what is called a "going concern" throughout the Class Period.

191. The term "going concern" is an accounting term for a company that has the necessary resources to continue operating indefinitely until there is evidence to the contrary. Going concern also refers to a company's ability to generate enough revenue to stay afloat or avoid bankruptcy. Furthermore, it is the company's auditor's responsibility to evaluate whether the company has the ability to continue as a going concern. In the scenario where the auditor determines there is substantial doubt regarding the company's ability to continue into the following year, the auditor must issue a "Going Concern Opinion."

192. During the Class Period, no such Going Concern Opinion was issued. However, FE 7—a leader in Corporate Accounting at Weatherford—explained that a Going Concern Opinion should have been issued on Weatherford from the start of the Class Period up until Weatherford announced bankruptcy. FE 7 explained that he was personally surprised that a Going Concern Opinion was not issued because he knew the financial condition of Weatherford and it was evident to him that Weatherford was losing a lot of money, struggling, and not likely to continue as a going concern. Indeed, FE 7 attributed Weatherford's increasing debt levels, among other things, as the primary cause of the Company's bankruptcy.

193. FE 4, who was on the Transformation Team and who met with various internal groups and departments to help them articulate their problem areas and incorporate changes that would cut costs and produce revenue, confirmed that he never saw signs of recovery within the Company, despite claims of such on earnings calls, to which he regularly called in to listen. Indeed, FE 4 stated that the Weatherford executives were lying when making representations to the market on earnings calls about their progress. FE 3 likewise stated that despite the Company laying out the Transformation Plan as if it was supposed to be the Company's savior, those in middle and senior management did not believe it by just looking at the profit and loss statements. Furthermore, according to FE 2, who was responsible for analyzing the effectiveness of the Transformation Plan and working to check on progress made toward these goals, the Transformation Plan did not stay on track and was not a success.

194. Additionally, FE 5, who was also on the Transformation Team and attended leadership meetings to discuss the Transformation Plan, stated that no matter what the Company was touting, there was never a doubt in his mind that the Company would have to file for

bankruptcy. FE 5 further stated that the pressure that he and his colleagues were under to "do the impossible" during his tenure made it abundantly clear that bankruptcy was the only remedy.

**D. Defendants Admit They Previously Knew They Would Not Improve Their Financial Condition as Much as They Touted, Partially Revealing the True Effects of Weatherford's Massive Debt**

195. Despite Defendants' continued misrepresentations about the Transformation Plan's purported progress and success at achieving the Company's targets and cutting down its debt, investors began to learn the true state of Weatherford's catastrophic financial condition in October 2018, when Defendants disclosed that their efforts to achieve their goals were failing.

196. On October 29, 2018 during an earnings call for the third quarter of 2018 ("3Q 2018 Earnings Call"), Defendants admitted that they knew from prior to 2018 that they would not be able to achieve all of the financial targets they touted.

197. Specifically, Defendant McCollum conceded: "***We knew coming into the year***, if we try to guide The Street, that ***we weren't going to necessarily get all the way there*** even though it will be a substantial increase over 2017, ***that we would probably still fall somewhat short in 2018 for generating breakeven cash flow***."

198. At that same time, Defendants' so-called cost-cutting measures were so ineffective at cutting down Weatherford's mounting debt that the Company was also forced to announce devastating financial results for the third quarter of 2018.

199. On October 29, 2018, prior to the market open, Weatherford reported a loss of $199 million, or 20 cents per share, for the third quarter of 2018. Additionally, Defendant Bausch announced during the 3Q 2018 Earnings Call that "[a]djusted free cash flow, excluding severance, transformation cash costs and land rig CapEx, was negative $35 million, short of our goal of positive cash flow for the quarter."

200. Furthermore, Defendant McCollum explained during the 3Q 2018 Earnings Call, "[w]hat we didn't see and what was kind of worked against us this year was that, particularly on receivables, that our DSOs [Days Sales Outstanding] increased, partly as a result of some customer actions." Defendant McCollum also disclosed "[t]he working capital opportunity remains. We still think we can get it, but the pace of getting that out has been slower than we wanted."

201. These disclosures and revelations were the first hints of the truth—*i.e.*, that the Transformation Plan was not working, unrealistic, and inadequate to save Weatherford against its massive indebtedness, and that the Company was headed for bankruptcy.

202. The October 29, 2018 disclosure caused Weatherford stock price to fall ***22.22%*** from $1.98 per share at close on Friday, October 26, 2018, to $1.54 per share at close on Monday, October 29, 2018. Weatherford's stock price further fell to $1.26 per share at close on October 30, 2018, an ***additional 18.18%***, as the market further digested the troubling news.

203. Indeed, after learning of the poor third quarter of 2018 results, analysts began to express concern about whether the Transformation Plan would actually remedy Weatherford's massive debt load. For example, a Barclays October 29, 2018 analyst report stated "[w]hat remained of investor confidence heading into 3Q18 results had largely evaporated by the time investors digested WFT's 3Q results and guidance." The report continued to explain, "[w]hile we are inclined to preach patience and allow the transformation to take hold, the clock is running out."

204. Furthermore, analysts began to link the poor third quarter 2018 results with Weatherford's massive debt load. For instance, analyst Credit Suisse on October 29, 2018 issued a report explaining that Weatherford's poor results were "due in part to its high debt levels in the

face of increasing macro concerns about the overall economy as well as specific concerns in the [oilfield services] sector about [Weatherford's] ability to reduce debt."

205. Critically, in light of missing its targets, during that 3Q 2018 Earnings Call on October 29, 2018, Defendant McCollum announced that "going forward, we're going to stop prognosticating about timing. We're still aggressively working on the same remaining basket of deals we originally said we would do, but they will get done when they get done. Our main priority is to continue executing on the transformation." Defendant Bausch similarly explained "[a]s [McCollum] pointed out and I mentioned as well, we will continue to work on the targets we had identified, but we don't commit to timing and amounts."

**E. Despite the Partial Revelation of Weatherford's True Financial Condition, Defendants Continued to Reassure Investors**

206. Yet, having just admitted that Defendants knew for over a year that they would "fall somewhat short" in the Company's targets, Defendant McCollum nevertheless reiterated, "I'm confident that we'll achieve our $1 billion incremental EBITDA run rate target in accordance with our original time line."

207. In fact, Defendant McCollum attempted to brush off the third quarter results and portrayed the problems that Weatherford was facing as mere "***bumps in the road***." Defendant Bausch joined in on the narrative and touted that "for the entire year, we will generate positive cash flow in 2019."

208. Despite some concerns analysts felt after hearing the poor third quarter results, Defendants' continued positive reassurances alleviated analysts' concerns. For example, on October 29, 2018, Credit Suisse issued an analyst report that provided that notwithstanding the poor financial results announced, Credit Suisse stated that "we see [Weatherford's targets] as achievable" based on Defendants positive misstatements. Indeed, Credit Suisse reported that

"we see WFT as a much better managed enterprise today than just a few years ago." That same report further explained that it still believed that Weatherford had years of viability: "The goal is not to be debt free but to reduce the debt to manageable levels by a combination of debt reduction and higher Ebitda generation. . . . Whether the company has to sell a crown jewel is yet to be seen and not even necessary for a couple of years."

209. Furthermore, Evercore published an analyst report also on October 29, 2018 believing that "WFT continues to make progress with its transformation program achieving annualized benefits of $300 million, approximately 30% of the total target." Raymond James similarly issued an analyst report that same day that commented, "[m]anagement reiterated its confidence in executing its transformation program and recommitted to the target of $1 [billion] annual EBITDA benefit by 2019," and further noted that the "[C]ompany is maintaining that it will generate free cash flow in 4Q [of 2018] and 2019." That same day Cowen also issued an analyst report that understood that "WFT is accelerating the debt reduction plan."

**F. Weatherford's Stock Price Fell Dangerously Low**

210. Continuing to feel the crippling effects of over $7 billion in debt and still no effective method of cutting it down in a significant way, Weatherford's stock found itself trading below $1.00. Consequently, on December 12, 2018, the SEC issued Weatherford a written notice informing the Company that it was "not in compliance with the NYSE continued listing standard with respect to the minimum average share price required by the NYSE, which requires the average closing price of the Company's ordinary shares to be at least $1.00 per share over a period of 30 consecutive trading days." Defendants announced their receipt of the NYSE written notice in a December 14, 2018 press release, and again in a Form 8-K dated December 14, 2018 and signed by Christina M. Ibrahim.

211. In both the December 14, 2018 press release and Form 8-K, Defendants explained that the "Company intends to regain compliance by completing its previously announced company-wide [T]ransformation [P]lan designed to improve its 2017 EBITDA run-rate by an incremental $1 billion by year-end 2019." Defendants also noted that the "Company may also explore other available options, including a reverse stock split, if appropriate."

212. Defendants continued to mislead analysts into thinking that the Transformation Plan was on track to reducing the Company's debt and achieving the financial targets. For example, on December 17, 2018, analyst RBC reported that it met with Weatherford in Houston in December, and one of the key takeaways was that the "Transformation [P]lan is on pace to deliver $1 [billion] in annualized EBITDA in 2019."

213. After the considerable stock drop in October and the NYSE notice of non-compliance in December 2018, the Company retained Lazard Frères & Co. LLC ("Lazard") on December 31, 2018, and Latham & Watkins LLP ("Latham") as restructuring counsel on April 1, 2019, to advise on further refinancing efforts and a possible balance sheet restructuring. Also, as far back as November 2018, Weatherford had also retained the firm, Alvarez & Marsal ("A&M"), to advise on the restructuring.

214. Indeed, according to a July 1, 2019 bankruptcy filing (specifically, the Declaration of Ryan Omohundro, the Managing Director of A&M), A&M "has been engaged as a restructuring advisor to Weatherford," and Omohundro had "led an A&M team which, since November 2018, has provided assistance in connection with [Weatherford's] evaluation and enhancement of [its] existing cash management system and liquidity forecasting process as well as support in connection with [Weatherford's] management and other advisors to evaluate [Weatherford's] liquidity and case needs in the event of a chapter 11 filing." However,

Defendants did not disclose either Weatherford's retention of A&M or Lazard at the time they were hired.

215. FE 15 corroborated Weatherford's retention of A&M when he recounted that when he met with his boss, Karen David Green, in Green's office in mid-December 2018, Green informed FE 15 that Weatherford had previously retained A&M. FE 15 explained that the subject of A&M came up because FE 15 was giving his two-week's notice because he had accepted a position at A&M. FE 15 explained that A&M specializes in bankruptcy consulting and turnarounds. FE 15 further recalled that the day after he met with Green, Green had a meeting with an A&M consultant, and when FE 15 looked at an email chain between Green and the A&M consultant, the emails dated back at least November 2018.

### G. Defendants Publicly Rejected Bankruptcy as an Option While They Were on the Eve of Bankruptcy

216. Despite the consistent reassurances by Defendants throughout the Class Period, the topic of bankruptcy was on the minds of many analysts in light of how poorly Weatherford's stock was trading. Yet, even when confronted with the topic point blank, Defendants again assured investors that the Company was not considering bankruptcy.

217. For instance, on February 1, 2019, during the fourth quarter of 2018 earnings call ("4Q 2018 Earnings Call"), a RBC analyst asked Defendant McCollum:

> And with the stock trading where it is, right, the elephant in the room and the question of the day is more like along the lines of given the dynamics at play, ***what, in your mind, would have to occur for there to be some serious consideration around the lines of a capital restructuring or voluntary sort of bankruptcy*?** That seems to be the question I'm getting most often from investors. So maybe you could provide your perspective on that.

218. Instead of coming clean and explaining to investors the actual state of Weatherford's financials, and months after Weatherford had retained bankruptcy and restructuring firms Lazard and A&M, Defendant McCollum responded by stating, "***<u>I don't waste</u>***

***a lot of time thinking or planning how to fail***," and explaining that "the actions that we can take is ***continuing to execute the [T]ransformation [P]lan*** and do that quarter in and quarter out and continue to improve the profitability, which ultimately will drive the cash flow of this organization and improve our credit metrics."

219. Defendant McCollum also reassured investors that Defendants "***made significant progress toward our ultimate goals***" and that the Transformation Plan was still "***on target***" to achieve Defendants' "$1 billion commitment by the end of 2019." Defendant McCollum further touted that Defendants had "***just about reached the halfway point of our [T]ransformation [P]lan***."

220. Defendants also removed any concerns investors had about the Company's abilities to face its massive debt, again, even though they had already retained bankruptcy counsel. For instance, in Weatherford's February 1, 2019 press release announcing its fourth quarter of 2018 earnings results, Defendant McCollum was quoted as stating that Defendants had "***sufficient liquidity to continue to execute*** ***on our strategic initiatives and pay down our near-term maturities***."

221. Analysts understood Defendants' statements as conveying the message that Defendants were not considering bankruptcy and that the Company had sufficient liquidity to meet its debt obligations.

222. Indeed, specifically referencing Defendant McCollum's statement about not thinking about how to fail, a February 1, 2019 analyst report by RBC reported: "Bottom line, the CEO sees no reason for WFT to consider a bankruptcy/capital restructuring." The same report noted that "WFT has sufficient liquidity to address the 2020 debt."

223. Similarly, a Credit Suisse analyst report issued that same day referred to Weatherford as "[n]ot [d]ead [y]et." The report continued: "In our opinion, WFT is not likely to declare bankruptcy in 2019. This is the 1st, 2nd, and often the 3rd question asked about WFT. . . . The company is on track to achieve the goal they set out over a year ago." The Credit Suisse report also noted that "completion of transformational efforts and Ebitda uplift are still promised." Moreover, citing the transformation scorecards published by the Company each quarter, the Credit Suisse reported that "[t]he two-year [T]ransformation [P]lan appears on track."

224. An analyst report issued by UBS that same day also took comfort in the fact that the Company announced that it would have "'sufficient liquidity' to continue to execute their strategic initiatives and pay down near-term maturities." Also on February 1, 2019, Wolfe Research issued an analyst report that believed that Weatherford "remains on track to achieve the full $1 [billion] run rate."

225. The media also was convinced that there was no chance Weatherford would file bankruptcy. For example, the Houston Chronicle published an article that same day, entitled, "As Weatherford Slides Deeper In Red, CEO Rules Out Bankruptcy," which stated—in direct reliance on Defendant McCollum's misstatement—that "Weatherford International is not going to file for bankruptcy, the struggling oil field service company's CEO Mark McCollum told investors on Friday." The article further acknowledged that "Weatherford Executive Vice President and Chief Financial Officer Christoph Bausch said the company will return to positive cash flow in 2019." Furthermore, although the article expressed doubt into how successful the company would be, it nevertheless believed Weatherford when it stated "Weatherford Executive

Vice President and Chief Financial Officer Christoph Bausch said the company will return to positive cash flow in 2019."

226. Analysts continued to express their positive outlooks days later as a response to Defendants' misstatements. For example, on February 4, 2019, JP Morgan issued an analyst report that stated "[w]e were encouraged by WFT's reiterated confidence in its transformation program." That same day, Jefferies issued an analyst report that indicated that "we don't disagree with the [C]ompany's contention that it has liquidity runway to muddle through."

227. As time went on, Defendants were still unable to improve Weatherford's financial situation despite Defendants' positive statements about their Transformation Plan making significant progress and having no issues meeting their liquidity needs. Faced with the possibility of being delisted from the NYSE, on April 30, 2019, Weatherford asked shareholders via proxy to vote to approve a reverse stock split at a ratio of 1-for-20, whereby every 20 ordinary shares will be consolidated into 1 ordinary share. Such a reverse stock split would artificially increase the per share trading price of Weatherford and avoid having its shares delisted from the NYSE.

228. On May 7, 2019, about a week after requesting approval of a reverse stock split, Weatherford issued a press release announcing that it was postponing its first quarter of 2019 earnings release until Friday, May 10, 2019. Defendants kept the public in the dark about the reason for the delay, and in no way indicated that they were on the eve of announcing their bankruptcy. For instance, a May 7, 2019 analyst report issued by Simmons Energy reported that "[Weatherford] has postponed its earnings release from the originally scheduled date of [May 8, 2019] until Friday, May 10th. [Weatherford] did not provide a reason for the delay."

### H. Weatherford Was Unable to Outrun Its Past and Announced Chapter 11 Bankruptcy Protection

229. May 10, 2019 came, but instead of releasing first quarter 2019 earnings, Defendants finally revealed the full truth of their fraudulent scheme. That is, the truth about the Transformation Plan's ineffectiveness at cutting Weatherford's massive debt and the truth about Defendants' inevitable need to file for bankruptcy ultimately materialized when Weatherford issued a press release on Friday, May 10, 2019 announcing that the ***Company executed a restructuring support agreement*** ("RSA") with a group of its senior noteholders. Weatherford explained that the RSA would be implemented ***through a "pre-packaged" Chapter 11 process*** and that Weatherford expected to file for U.S. Chapter 11 protection.

230. At the same time Weatherford fully revealed the Company's true financial condition, Defendant McCollum was quoted in the press release discussing the Transformation Plan. Defendant McCollum, despite having just briefly described the Transformation Plan's goals, reluctantly disclosed, "[h]owever, ***we still face a high level of debt that affects our ability to make investments in our Company and implement further elements of our [T]ransformation [P]lan***."

231. Additionally, Weatherford filed a Form 10-Q also on May 10, 2019, where Defendants likewise disclosed the true financial condition of Weatherford. In direct contradiction to Defendants' statement from a few months prior about having sufficient liquidity to meet the Company's short-term debt obligations, Defendants revealed that "the Company believes that ***it will not be able to generate sufficient liquidity to service all of its debt and other obligations or comply with its debt covenants at some point within the next twelve months***." Defendants further explained that "[t]hese conditions raise substantial doubt about our ability to continue as a going concern." Defendants continued, "[a]s a result of the substantial doubt about

our ability to continue as a going concern we no longer have access to the remainder of our borrowing availability under our Revolving Credit Agreements."

232. Defendants' bankruptcy announcement was therefore in direct contrast to all of their previous positive statements about the Transformation Plan's efforts of reducing debt. Indeed, Defendants themselves even later acknowledged in a July 1, 2019 declaration filed on the first day of bankruptcy proceedings (and signed by Defendant Bausch) (the "First Day Declaration"), that "[d]espite several successful strategic divestitures, the Company remained overleveraged, with debt service payments hampering its ability to use the proceeds of these divestitures to invest in the business and the new initiatives, or to sufficiently increase the Company's liquidity position."

233. Defendants similarly conceded in their First Day Declaration that "[d]espite management's best efforts, performance and liquidity continued to further deteriorate and it became apparent that the Company's revenue and cash flow generating capacity would be insufficient to service its outstanding debt on a long-term basis and to maintain the liquidity necessary to operate its business and maximize long-term enterprise value."

234. On May 13, 2019, the Monday following the bankruptcy announcement, Weatherford received a letter from the NYSE confirming that the NYSE had suspended trading in the Company's ordinary shares effective prior to the market open on May 13, 2019, and announcing its intention to commence proceedings to delist the Company's ordinary shares from the NYSE. The NYSE stated that the Company was no longer suitable for listing based on the Company's "abnormally low" price levels. The NYSE also stated that, in making its determination, it also considered the Company's announcement on May 10, 2019 that it had

executed the RSA and expects to implement the RSA through a pre-packaged Chapter 11 process.

235. Trading of the Company's ordinary shares on the OTC Bulletin Board or "pink sheets" market commenced on May 14, 2019 under the symbol "WFTIF." Then, on Tuesday, May 14, 2019, the first trading day after Defendants' May 10, 2019 bankruptcy announcement, ***Weatherford's share price plummeted 86.49%***, closing at $0.05 per share down from May 10, 2019's closing price of $0.37 per share.

236. Analysts and the media were shocked by the bankruptcy announcement and were upset that Defendants had concealed Weatherford's true financial condition. On Saturday, May 11, 2019, the day after the RSA was announced, for the first time realizing the Transformation Plan's initiatives were not enough to save Weatherford, Bloomberg News reported that "[d]ebt of $8 billion became unsustainable as revenue faded."

237. The next day, on May 12, 2019, Simmons Energy issued an analyst report, explaining, "[i]n the end, [Weatherford] went away quietly into the night this past Friday, ***filing a 10Q which revealed its insolvency and its corresponding attempts to reorganize***." Furthermore, the report stated that "[t]he surprise wasn't so much the outcome of [Weatherford's] declared insolvency ***but the duration of the company's purgatory***." In other words, even if analyst Simmons Energy had a feeling Weatherford would eventually one day have to declare bankruptcy, Simmons Energy was at least under the impression that the possibility of bankruptcy was way down the road.

238. Simmons Energy's report continued to explain that "there continued to be ongoing rationalizations about the unrelenting consumption cash," which "was an ***economically unsustainable reality given the company's unyielding debt load***." The report continued: "[a]s,

if not more, important, was the ***lack of visibility*** burdening the [C]ompany in the form of 'the retention of our key personnel, access to debt and equity credit at suitable terms, our level of working capital and our ability to execute within our targeted timing on our transformation.'"

239. On May 13, 2019, Wolfe Research published a report that again took issue with Weatherford's lack of transparency. For example, in addition to dropping coverage on Weatherford, the report explained that "***we didn't have enough visibility into refinancing options to determine if/when the [C]ompany would file for bankruptcy protection***."

240. On June 28, 2019, the Defendants filed with the SEC a Form 8-K with their *Disclosure Statement For Joint Prepackaged Plan of Reorganization for Weatherford International PLC and its Affiliated Debtors Under Chapter 11 of the Bankruptcy Code* along with their *Joint Prepackaged Plan of Reorganization For Weatherford International PLC and its Affiliate Debtors Under Chapter 11 of the Bankruptcy Code* (the "Chapter 11 Plan"). The Chapter 11 Plan purports to effectuate the transaction agreed to in the RSA, and provide for the distribution of New Common Stock to existing shareholders.

241. Finally, on July 1, 2019—at which point Defendants had outstanding funded debt obligations consisting of approximately $8.35 billion—Weatherford issued a press release announcing that the Company had initiated its previously-announced financial restructuring by commencing voluntary cases under Chapter 11 of the U.S. Bankruptcy Code to effectuate its RSA. The RSA (and the Chapter 11 Plan that followed) generally provides for approximately (i) 94% of the New Common Stock to be distributed to the Noteholders; (ii) 1% of the New Common Stock to be distributed to existing Shareholders; and (iii) 5% set aside for the Management Incentive Plan (defined below).

242. Subsequently, on September 9, 2019, the Company filed with the Bankruptcy Court the proposed Second Amended Joint Prepackaged Plan of Reorganization of Weatherford International plc and its Affiliate Debtors, which the Bankruptcy Court confirmed and approved on September 11, 2019. On December 13, 2019, the plan became effective pursuant to its terms and the Company emerged from bankruptcy, eliminating approximately $6.2 billion of outstanding funded debt.

## V. DEFENDANTS' FALSE AND MISLEADING STATEMENTS

243. Lead Plaintiff alleges that the statements highlighted in bold and italics within this section were knowingly and materially false and misleading and/or omitted to disclose material information of which Defendants were aware or were reckless in not knowing. As alleged herein, such statements artificially inflated or maintained the price of Weatherford's publicly traded common stock and operated as a fraud or deceit on all persons and entities that purchased common stock during the Class Period.

244. Throughout the Class Period, Defendants made a series of misrepresentations concerning the viability of Weatherford's future, in which they misled investors concerning the Transformation Plan's ability to cut down the Company's massive debt and avoid bankruptcy.

### A. Defendants' False and Misleading Statements During 2016

#### 1. October 26, 2016 – 3Q 2016 Earnings Call

245. On October 26, 2016, Defendants held a conference call discussing the earnings results for the third quarter of 2016 ("3Q 2016 Earnings Call"). During the 3Q 2016 Earnings Call, Defendant Duroc-Danner assured investors that the "***cuts in fixed costs are permanent and <u>sustainable</u>***."

246. During that same earnings call, Defendant Shivram similarly explained that Defendants "***have enough liquidity to manage [the Company's] needs***," meaning, its debt obligations.

247. Defendant Shivram further touted to investors during that call that "***there is no existential liquidity issue now for Weatherford***."

248. Defendant Shivram further told investors on that call that Defendants "***have been making normal payments to our vendors, which in a sense is similar to paying down debt obligations***."

249. Defendants' statements during the 3Q 2016 Earnings Call concerning cost cuts being "permanent and sustainable," "hav[ing] enough liquidity," and "no existential liquidity issue" were materially false and misleading because, unbeknownst to investors, Weatherford's cost-cutting measures were wholly inadequate to combat the Company's over $7 billion of debt in any meaningful, permanent, or sustainable way, and thus were not preventing Defendants from going bankrupt.

250. Indeed, according to former Weatherford employees (*see supra* Sections IV.C.2, 6), Defendants knew or were reckless in not knowing that the Company's cost-cutting measures were ineffective and wholly inadequate at reducing the Company's debt because any cost cuts the Company achieved or revenue the Company was able to generate, were nothing compared to the billions Weatherford had in debt. Additionally, Defendants' statements were materially false and misleading because bankruptcy was not a matter of if, but instead, was highly likely and necessary from the beginning of the Class Period given that:

(a) internal profit and loss statements illustrated Weatherford's deteriorating financial condition and the Company's need to file bankruptcy; and

(b) as recounted by FE 7, who worked at Weatherford as a leader in Corporate Accounting, it was evident from before the Class Period that Weatherford was losing a lot of money, struggling, and not likely to continue as a going concern.

251. Moreover, unbeknownst to investors, numerous former Weatherford employees (*see supra* Section IV.C.1) confirm that far from reducing Weatherford's debt, the cost-cutting measures were ineffective and in fact contributing to Weatherford's growing debt—forcing Defendants intentionally to delay payments to their vendors and contractors, or not pay them at all, in order to stay afloat financially and avoid bankruptcy. Thus, Defendants' statement that they "have been making normal payments to our vendors, which in a sense is similar to paying down debt obligations" was materially false and misleading because:

(a) the Company was not paying its vendors and in fact had systemically delayed paying its vendors as far back as first quarter 2016, and thereafter continued to extend its payment terms with its vendors throughout the Class Period, eventually extending to Net 180 days;

(b) the Company implemented a company-wide policy whereby Weatherford would seek steep discounts ranging from 10% to 20% from its vendors and supplier; and

(c) as a result of not timely paying its vendors and requiring steep discounts, Weatherford's vendors became irritated with the Company, and ultimately refused to work with Weatherford because of the risks and unlikelihood of receiving full payment.

**2. October 28, 2016 – 3Q 2016 Form 10-Q**

252. On October 28, 2016, Weatherford filed with the SEC its Third Quarter 2016 Form 10-Q ("3Q 2016 Form 10-Q"), which was signed by Defendants Duroc-Danner and Shivram. The 3Q 2016 Form 10-Q incorporated by referenced Weatherford's Form 10-K for the fiscal year ended December 31, 2015 ("2015 Form 10-K"), as filed with the SEC on February

16, 2016. The 2015 Form 10-K included a list of "risks and uncertainties" that "***may* cause actual results to be materially different from projected results**," which included "our high level of indebtedness and our ability to service our indebtedness."

253. In addition to the reasons set forth in paragraphs 249–251 herein, the statement incorporated by reference in Weatherford's 3Q 2016 Form 10-Q was materially false and misleading because it was misleading for Defendants to issue a warning that Weatherford ***may*** have these adverse causes when Defendants already knew, or were reckless in not knowing, that Weatherford's purported "recovery" was inadequate and that the Company would be forced to file for bankruptcy.

**3. November 9, 2016 – Wall Street Journal Article**

254. Shortly thereafter, Weatherford issued a press release on November 9, 2016 announcing the departure of Defendant Duroc-Danner as Chairman of the Board, President, and CEO. The November 9, 2016 press release further stated that Defendant Shivram would lead the Company as interim CEO, and will continue as CFO until a new CFO is named.

255. According to a November 9, 2016 Wall Street Journal article, entitled, "Weatherford Chief Executive Duroc-Danner Steps Down," Defendant Duroc-Danner was interviewed on the same day of his departure, and he asserted that, despite the Company's high indebtedness, he sees "***no remote possibility***" that the Company would not be able to manage its debt.

256. Defendant Duroc-Danner's statement during his November 9, 2016 interview quoted in the Wall Street Journal that he sees "no remote possibility" that the Company would not be able to manage its debt was materially false and misleading for the same reasons set forth in paragraphs 249–251 herein.

### B. Defendants' False and Misleading Statements During 2017

#### 1. February 1, 2017 – Form 8-K

257. Through in large part debt and equity raises, Weatherford was able to reduce its debt by $507 million to $6.5 billion in the fourth quarter of 2016. To that end, Defendant Shivram stated in a February 1, 2017 press release, attached to the Form 8-K signed by Defendant Bausch and filed with the SEC that same day, that "[a]fter a protracted period of relentless cost structure transformation, implementation of disciplined financial metrics and the overall realignment of our Company, ***Weatherford is <u>now well positioned with a streamlined portfolio</u> to make material progress in operating results and to deleverage our balance sheet***."

#### 2. February 2, 2017 – 4Q 2016 Earnings Call

258. On February 2, 2017, Defendants held a conference call discussing the earnings results for the fourth quarter of 2016 ("4Q 2016 Earnings Call"). During that earnings call, Defendant Shivram continued to mislead investors. For example, Defendant Shivram stated "[w]e have just been through the most brutal down cycle in our industry's history and ***we have not only survived, we <u>have transformed the Company internally and positioned it well</u> for the multi-year up cycle that is just about beginning***."

259. Defendants' statements within the February 1, 2017 Form 8-K and during the 4Q 2016 Earnings Call that Defendants' were "well-positioned to . . . deleverage [their] balance sheet" and that Defendants have not only survived, [but they] have transformed the Company internally" were materially false and misleading for the same reasons set forth in paragraphs 249–251 herein.

**3. February 14, 2017 – 2016 Form 10-K**

260. On February 14, 2017, Weatherford filed with the SEC its 2016 Form 10-K for the year ended December 31, 2016 ("2016 Form 10-K"). The 2016 Form 10-K was signed by Defendants Shivram, Bausch, and Mills.

261. In the 2016 Form 10-K, Defendants listed numerous "Risk Factors," including that "***[o]ur indebtedness and liabilities could limit cash flow available for our operations, expose us to risks that could adversely affect our business, financial condition and results of operations and impair our ability to satisfy our obligations under the notes***."

262. The Risk Factors in the 2016 Form 10-K were incorporated by reference into Weatherford's Forms 10-Q, each signed by Defendants Bausch and Mills, filed with the SEC on April 28, 2017, August 1, 2017, and November 1, 2017.

263. In addition to the reasons set forth in paragraphs 249–251 herein, the statement in Weatherford's 2016 Form 10-K and Forms 10-Q, which incorporated such statement, was materially false and misleading when made because it was misleading for Defendants to issue a warning that Weatherford's indebtedness merely ***could*** have these adverse causes when Defendants already knew, or were reckless in not knowing, that Weatherford's purported "recovery" was inadequate and that the Company would be forced to file for bankruptcy.

**4. November 1, 2017 – 3Q 2017 Earnings Call**

264. On November 1, 2017, Defendants held a conference call discussing the earnings results for the third quarter of 2017 ("3Q 2017 Earnings Call"). During the 3Q 2017 Earnings Call, Defendants provided additional details about the Transformation Plan, as well as set certain targets related to profitability and cutting down Weatherford's debt. For instance, Defendant McCollum explained that Weatherford's transformation efforts will achieve "$1 billion in profit improvements over the next 18 to 24 months" and their "goal is to cut our debt-to-EBITDA

ratios by more than half by the end of 2019." Weatherford's targets of profitability and cutting down its debt ratios, however, were not mere aspirations: During the 3Q 2017 Earnings Call, Defendant McCollum unequivocally told investors that "based on ***all the benchmarking and internal analysis we <u>have done</u>***, we believe these targets can definitely be achieved. We know what we need to do."

265. Defendant McCollum's statements during the 3Q 2017 Earnings Call were materially false and misleading for the same reasons set forth in paragraphs 249–251 herein.

266. These statements were further materially false and misleading because, even after compiling the Company's cost-cutting measures into the formal Transformation Plan, numerous former Weatherford employees (*see supra* Sections IV.C.1–4) confirm that the Company's transformational efforts via the Transformation Plan were still ineffective and wholly inadequate at reducing the Company's debt, attaining positive free cash flow, or avoiding bankruptcy because:

(a) the Transformation Plan's over 1,500 initiatives were merely a disorganized list of employee suggestions that were not prioritized or vetted for effectiveness;

(b) many of the initiatives had already existed prior to implementing the Transformation Plan, such as procedures for field workers to wash, clean, and organize their trucks to save time and money or a "knowledge sharing" forum where workers at the Company's various locations could submit lessons learned and get feedback;

(c) many of the initiatives in fact caused further harm to the Company, such as delaying payments to the Company's vendors (or not paying them at all) until the vendors refused to conduct any business with Weatherford, leaving important divisions with insufficient resources to process service orders, or by shifting power to the Sales Division to the point where

salespersons were incentivized to and did enter into deals where the Company would incur a loss and fail to generate the revenue needed to combat the Company's debt; and

(d) any revenue that Weatherford was able to generate from sales of parts of its business was a mere drop in the bucket compared to the over $7 billion and growing debt Weatherford had on the books, and therefore stood no chance at paying down the debt throughout the entire Class Period.

**C. Defendants' False and Misleading Statements During 2018**

**1. February 2, 2018 – Press Release Attached to Form 8-K**

267. On February 2, 2018, Weatherford issued a press release, attached to the Form 8-K filed with the SEC and signed by Defendant Bausch on the same day, announcing the results for the fourth quarter of 2017. In that press release, Defendant McCollum was quoted, and continued to create the impression to investors that Weatherford was on track to achieving its targets: "In 2017, we set the stage for the future of Weatherford. ***We have made significant progress***, taking decisive and strategic actions throughout 2017. In addition to realigning and flattening our structure, ***we initiated an organizational [T]ransformation [P]lan*** that will create an estimated $1 billion in profit improvements over the next 18 to 24 months. Since announcing this plan last quarter, ***we have taken further steps as an organization to develop rigorous, detailed plans and validate our ability to meet this target***."

**2. February 2, 2018 – 4Q 2017 Earnings Call**

268. On February 2, 2018, Defendants held a conference call discussing the earnings results for the fourth quarter of 2017 ("4Q 2017 Earnings Call"). During the 4Q 2017 Earnings Call, although Defendant McCollum reaffirmed the Company's profitability and debt reduction targets, he was not just optimistic about achieving these goals. Indeed, Defendant McCollum boldly stated:

> [W]e've put a project management organization and process in place to ensure that all of the collective profit improvement initiatives will be implemented on time and on target. ***Bottom line, <u>we have a clear line of sight</u> on the $1 billion transformation goal as well as <u>a disciplined process in place</u> designed to ensure that we can deliver.*** This is an undeniable, realistic and, most importantly, achievable opportunity.

**3. February 13, 2018 – Credit Suisse Energy Summit**

269. On February 13, 2018, roughly two weeks after their 4Q 2017 Earnings Call, Defendants participated on a conference call at the Credit Suisse Energy Summit, where Defendant McCollum again doubled-down on Defendants' ability to reduce debt and become profitable, rising it above the level of rosy aspirations, and stated:

> ***We have a clear line of sight on the target as well as a disciplined process in place, designed to ensure that we can deliver.*** This is an undeniable, it's a realistic, and most importantly, it's an achievable goal. ***I'm staking my career on that****.*

270. Directly in response to Defendant McCollum's misstatements, a Credit Suisse AG analyst exclaimed, "[t]his is the most positive presentation I think I've ever seen on the company called Weatherford. And having known your career in the business and you're staking it on it, we're going to keep our buy rating on the stock for now, just so you know."

271. Defendants' statements within the February 2, 2018 press release, and during the 4Q 2017 Earnings Call and the Credit Suisse Energy Summit that their transformation efforts were making "significant progress," that they had "taken further steps as an organization to develop rigorous, detailed plans and validate our ability to meet this target," and that they have a "clear line of sight on the $1 billion transformation goal as well as a disciplined process in place designed to ensure that we can deliver" were materially false and misleading for the same reasons set forth in paragraphs 249–251 and 266 herein.

**4. February 14, 2018 – 2017 Form 10-K**

272. On February 14, 2018, Weatherford filed with the SEC its Form 10-K for the year ended December 31, 2017 ("2017 Form 10-K"). The 2017 Form 10-K was signed by Defendants McCollum, Bausch, and Mills.

273. In the 2017 Form 10-K, Defendants listed numerous "Risk Factors," including that "***[o]ur indebtedness and liabilities <u>could</u> limit cash flow available for our operations, expose us to risks that <u>could</u> adversely affect our business, financial condition and results of operations and impair our ability to satisfy our financial obligations***."

274. The Risk Factors in the 2017 Form 10-K were incorporated by reference into Weatherford's Forms 10-Q, each signed by Defendants Bausch and Fraser, filed with the SEC on May 2, 2018, August 9, 2018 and November 2, 2018.

275. In addition to the reasons set forth in paragraphs 249–251 and 266 herein, the statement in Weatherford's 2017 Form 10-K and Forms 10-Q, which incorporated such statement, was materially false and misleading when made because it was misleading for Defendants to issue a warning that Weatherford's indebtedness merely ***could*** have these adverse causes when Defendants already knew, or were reckless in not knowing, that Weatherford's purported "recovery" was inadequate and that the Company would eventually be forced to file for bankruptcy.

**5. March 13, 2018 – 2017 Annual Report**

276. On March 13, 2018, Weatherford published its 2017 Annual Report on its website, which was signed by Defendant McCollum. The 2017 Annual Report again reaffirmed that Defendants were on track to achieving their financial targets based on data and information available to them at the time of the misstatement: "***[W]e are currently executing detailed, comprehensive, and clearly defined action plans designed to get us to our $1 billion goal***.

Bottom line: ***We have a clear line of sight*** on our $1 billion goal as well as ***a disciplined process in place designed to ensure that we can deliver***."

277. Defendants' statements within Weatherford's 2017 Annual Report that they "are currently executing detailed, comprehensive, and clearly defined action plans" and "have a clear line of sight" were materially false and misleading for the same reasons set forth in paragraphs 249–251 and 266 herein.

### 6. April 24, 2018 – Press Release Attached to Form 8-K

278. On April 24, 2018, Weatherford issued a press release, which was attached to the Form 8-K filed with the SEC and signed by Defendant Bausch on the same day, announcing results for the first quarter of 2018. The press release quoted Defendant McCollum as touting that "[t]he goals we have set forth for 2018 and 2019 are realistic and achievable" and informing investors that "***[w]e are on track***."

### 7. April 24, 2018 – 1Q 2018 Earnings Call

279. On April 24, 2018, Defendants held a conference call discussing the earnings results for the first quarter of 2018 ("1Q 2018 Earnings Call"). During 1Q 2018 Earnings Call, Defendant McCollum reiterated: "We have set a measurable target of $1 billion, and ***I assure you that this is an achievable goal***."

### 8. July 27, 2018 – Press Release Attached to Form 8-K

280. On July 27, 2018, Defendants issued a press release, which was attached to a Form 8-K filed with the SEC and signed by Defendant Bausch on the same day, announcing the results for the second quarter of 2018. In that press release, Defendant McCollum reaffirmed that the Transformation Plan was on track to achieving the Company's goals. Specifically, Defendant McCollum stated, "[a]s global activity levels continue to improve and ***our transformation <u>continues</u> to gain momentum***, I remain confident that we will reach our

previously outlined operational and financial objectives, including achieving $1 billion in annualized recurring adjusted EBITDA benefit by year- end 2019."

281. Defendants' statements within the April 24, 2018 press release, during the 1Q 2018 Earnings Call, and within the July 27, 2018 press release that Defendants were "on track," that this is an "achievable goal," and that their "transformation continues to gain momentum" were materially false and misleading for the same reasons set forth in paragraphs 249–251 and 266 herein.

**9. July 27, 2018 – 2Q 2018 Earnings Call**

282. On July 27, 2018, Defendants also held a conference call to discuss the earnings results for the second quarter of 2018 ("2Q 2018 Earnings Call"). During the 2Q 2018 Earnings Call, Defendant McCollum explained that: "Our transformation is in full force, and we now have tangible evidence of its effect on our bottom line and back-to-back quarters. With a clear mission, the right organizational structure and a solid strategy, our Weatherford team is embracing this challenge head on. And together, ***we have already made considerable progress toward our ultimate goals***."

283. On that same call, Defendant Bausch touted that "***[o]ur transformation initiatives continued to gain momentum during the second quarter, delivering sequential recurring improvements, in line with the guidance we provided on the last conference call***."

**10. September 5, 2018 – Barclays Energy Power CEO Conference**

284. On September 5, 2018, Defendants participated in the Barclays Energy Power CEO Conference, where they continued to tout the purported positive results of the Transformation Plan. Specifically, Defendant McCollum began by explaining the journey Weatherford had taken: "Transformation. When I stood here a year ago, this was just a word that we had yet to define at Weatherford. Fast forward through more than a year of intense

planning and focus, and I can confidently stand before you and say that this word has come to life for us. Not only that, it's paving the way for our turnaround, with tremendous heavy lifting, ***we've made an impressive – we've made impressive progress in our transformation, which we can see impacting our bottom line in back-to-back quarters***."

285. Defendant McCollum shortly thereafter stated that Weatherford was making "***material progress***" in its "***transformation, which is on target and driving us forward on our journey to sustainable profitability***."

286. Defendants' statements during the 2Q 2018 Earnings Call and Barclays Energy Power CEO Conference that Defendants were making "considerable," "impressive," and "material" progress in their transformation efforts and the "transformation initiatives continued to gain momentum" were materially false and misleading for the same reasons set forth in paragraphs 249–251 and 266 herein.

287. These statements were also materially false and misleading because, as set forth in Section IV.C.5, during the second quarter of 2018, Defendant Fraser explicitly informed FE 1 that the Company was seriously preparing for bankruptcy, and indicated that bankruptcy was imminent.

**11. October 29, 2018 – 3Q 2018 Earnings Call**

288. On October 29, 2018, Defendants announced the results for the third quarter of 2018. Weatherford reported a loss of $199 million, or 20 cents per share, for the third quarter of 2018. Additionally, Defendants held a conference call to discuss the earnings results for the third quarter of 2018 on that same day ("3Q 2018 Earnings Call"), and Defendant Bausch announced during that earnings call that "[a]djusted free cash flow, excluding severance, transformation cash costs and land rig CapEx, was negative $35 million, short of our goal of positive cash flow for the quarter." Furthermore, Defendant McCollum explained "[w]hat we

didn't see and what was kind of worked against us this year was that, particularly on receivables, that our DSOs [Days Sales Outstanding] increased, partly as a result of some customer actions." Defendant McCollum also disclosed "[t]he working capital opportunity remains. We still think we can get it, but the pace of getting that out has been slower than we wanted."

289. These disclosures and revelations were the first hints of the truth – *i.e.*, that the Transformation Plan was not working, unrealistic, and inadequate to save Weatherford against its massive indebtedness, and that the Company was headed for bankruptcy. However, Defendants continued to mislead investors.

290. For example, on October 29, 2018, during the 3Q 2018 Earnings Call, Defendant McCollum attempted to brush off the third quarter results and portrayed the problems that Weatherford was facing as mere "***bumps in the road***."

291. Defendant McCollum further stated during that call that: "***I mean, the transformation is working. We're improving our earnings along the lines that we believe that we would. The working capital opportunity remains***."

292. Defendants' statements during the 3Q 2018 Earnings Call that the poor earnings announcements and partial revelations of the truth were mere "bumps in the road" and that the "transformation is working" were materially false and misleading for the same reasons set forth in paragraphs 249–251, 266, and 287 herein.

293. These statements were also materially false and misleading because, as set forth in Section IV.C.5, according to FE 1, Defendant Fraser informed him that Weatherford was meeting with attorneys about bankruptcy by the third quarter of 2018.

**D. Defendants' False and Misleading Statements During 2019**

**1. February 1, 2019 – Press Release Attached to Form 8-K**

294. On February 1, 2019, Weatherford issued a press release, attached to the Company's Form 8-K filed with the SEC and signed by Defendant Bausch on the same day, announcing the results for the fourth quarter of 2018. In that press release, Defendant McCollum stated: "Our year-end liquidity position of over $900 million and the recent announcements regarding the divestiture of our laboratory services and surface data logging businesses will continue to improve our net debt position as we move through 2019, ***giving us <u>sufficient liquidity</u> to <u>continue</u> to execute on our strategic initiatives and pay down our near-term maturities***."

**2. February 1, 2019 – 4Q 2018 Earnings Call**

295. On February 1, 2019, Defendants held a conference call to discuss the earnings results for the fourth quarter of 2018 ("4Q 2018 Earnings Call"). Despite all of the reassurances given by Defendants throughout the Class Period thus far, the topic of bankruptcy was on the minds of many analysts in light of how poorly Weatherford's stock was trading. Yet, even when confronted with the topic point blank, Defendants assured investors that the Company was not considering bankruptcy

296. For instance, during the 4Q 2018 Earnings Call, an RBC Capital Markets analyst asked Defendant McCollum:

> And with the stock trading where it is, right, the elephant in the room and the question of the day is more like along the lines of given the dynamics at play, what, in your mind, would have to occur for there to be some serious consideration around the lines of a capital restructuring or voluntary sort of bankruptcy? That seems to be the question I'm getting most often from investors. So maybe you could provide your perspective on that.

297. Instead of coming clean and explaining to investors the actual state Weatherford's financials, Defendant McCollum responded by stating, "***I don't waste a lot of time thinking or planning how to fail***" and explaining that "***the actions that we can take is continuing to execute the [T]ransformation [P]lan and do that quarter in and quarter out and continue to improve the profitability***, which ultimately will drive the cash flow of this organization and improve our credit metrics."

298. Defendant McCollum also reassured investors during that call that "***[o]ur [T]ransformation [P]lan remains generally on target against our internal work timeline***, and we continue to believe that we can deliver on our $1 billion commitment by the end of 2019."

299. Similarly, Defendant McCollum explained, "[o]ur transformation will continue to be the main driver of year-over-year EBITDA improvement in 2019. ***We've made significant progress toward our ultimate goals***, but we're also exercising the discipline to complete our internal initiatives no matter what the market brings." Defendant McCollum also touted that Defendants had "***just about reached the halfway point of our [T]ransformation [P]lan***."

300. Investors undoubtedly understood Defendants' statements as conveying the message that Defendants were not considering bankruptcy and that the Company had sufficient liquidity to meet its debt obligations. Indeed, specifically referencing Defendant McCollum's statement about not thinking about how to fail, a February 1, 2019 analyst report by RBC reported: "Bottom line, the CEO sees no reason for WFT to consider a bankruptcy/capital restructuring." The same report noted that "WFT has sufficient liquidity to address the 2020 debt."

301. Similarly, a Credit Suisse analyst report issued that same day referred to Weatherford as "[n]ot [d]ead [y]et." The report continued: "In our opinion, WFT is not likely to

declare bankruptcy in 2019. This is the 1st, 2nd, and often the 3rd question asked about WFT. . . . The company is on track to achieve the goal they set out over a year ago." The Credit Suisse report also noted that "completion of transformational efforts and Ebitda uplift are still promised." Moreover, citing the transformation scorecards published by the Company each quarter, the Credit Suisse reported that "[t]he two-year [T]ransformation [P]lan appears on track."

302. The media also was convinced that there was no chance Weatherford would file bankruptcy. For example, the Houston Chronicle published an article that same day, entitled, "As Weatherford Slides Deeper In Red, CEO Rules Out Bankruptcy," which stated—in direct reliance on Defendant McCollum's misstatement—that "Weatherford International is not going to file for bankruptcy, the struggling oil field service company's CEO Mark McCollum told investors on Friday." The article further acknowledged that "Weatherford Executive Vice President and Chief Financial Officer Christoph Bausch said the company will return to positive cash flow in 2019."

303. Defendants' statements within the February 1, 2019 press release and during the 4Q 2018 Earnings Call that Defendants had "sufficient liquidity to continue to execute on our strategic initiatives and pay down our near-term maturities," that Defendants "don't waste a lot of time thinking or planning how to fail," that "[o]ur [T]ransformation [P]lan remains generally on target against our internal work timeline," that "[w]e've made significant progress toward our ultimate goals," and that Defendants had "just about reached the halfway point of our [T]ransformation [P]lan" were materially false and misleading for the same reasons set forth in paragraphs 249–251, 266, 287, and 293 herein.

304. These statements were also materially false and misleading because, as set forth in Section IV.F, as far back as November 2018, the Company retained the firm, A&M, to advise on the restructuring. Indeed, according to Defendants' own bankruptcy filings, the Company similarly retained Lazard on December 31, 2018 to advise on further refinancing efforts and a possible balance sheet restructuring.

305. As further support that these statements were false and misleading, as set forth in Section IV.C.1, according to FE 3, in November or December of 2018, because the Company was struggling financially and wanted its financial statements to look good, Weatherford did not pay any bills so the Company would turn a profit.

**3. February 15, 2019 – 2018 Form 10-K**

306. On February 15, 2019, Weatherford filed with the SEC its Form 10-K for the year ended December 31, 2018 ("2018 Form 10-K"). The 2018 Form 10-K was signed by Defendants McCollum, Bausch, and Fraser.

307. In its 2018 Form 10-K, Defendants listed as "Risk Factor" that "***[w]e may not be able to generate sufficient cash flows to service our indebtedness and may be forced to take actions in order to satisfy our obligations under our indebtedness***."

308. In addition to the reasons set forth in paragraphs 249–251, 266, 287, 293, and 304–305 herein, the statement in Weatherford's 2018 Form 10-K was materially false and misleading because it was misleading for Defendants to issue a warning that Weatherford "may not" be able to generate sufficient cash flows, when Defendants knew, or were reckless in not knowing, that the Company's Transformation Plan had little, if any, chance of success. Indeed, at the time, Weatherford's bankruptcy plan was already being negotiated.

#### 4. May 1, 2019 – 2018 Annual Report

309. On May 1, 2019, just nine days before Defendants announced they would have to file bankruptcy, Weatherford published its 2018 Annual Report on its website, which was signed by Defendant McCollum. With respect to "transform[ing] Weatherford into a company with sustainable profitability and long-term growth potential," the 2018 Annual Report stated that, "[e]ven in the face of difficult circumstances, we stayed the course and ***made meaningful progress towards our goals***." The report continued to tout that "***[w]e <u>continue</u> to execute on our [T]ransformation [P]lan*** and believe that we can deliver on our target of $1 billion in annualized transformation benefits."

310. Defendants' statements within Weatherford's 2018 Annual Report that they "made meaningful progress towards our goals" and that they "continue to execute on our transformation plan" were materially false and misleading for the same reasons set forth in paragraphs 249–251, 266, 287, 293, and 304–305 herein.

## VI. THE TRUTH ABOUT THE FULL IMPACT OF THE FRAUD IS GRADUALLY REVEALED

311. As set forth in Sections IV.D–H, *supra*, the full extent of Defendants' fraud was gradually revealed through the disclosure of new information about the Transformation Plan's inability to effectively reduce the Company's debt and to prevent the Company from having to file for the inevitable Chapter 11 bankruptcy protection. On October 29, 2018, for the first time, Defendants partially revealed that progress towards their targets had been slower than they had wanted. In fact, Defendant McCollum conceded that Defendants "knew coming into the year" that Defendants "would probably still fall somewhat short in 2018 for generating breakeven cash flow." On that same day, Defendants further announced a loss of $199 million for the third

quarter of 2018 and an adjusted free cash flow of negative $35 million, which Defendant Bausch disclosed was "short of our goal of positive cash flow for the quarter."

312. In response, Weatherford stock price fell ***22.22%*** from $1.98 per share at close on Friday, October 26, 2018, to $1.54 per share at close on Monday, October 29, 2018. Weatherford's stock price further fell to $1.26 per share at close on October 30, 2018, an ***additional 18.18%***, as the market further digested the troubling news.

313. However, the Company's stock price remained artificially inflated after this announcement as Defendants knew and failed to disclose or deliberately disregarded that the Transformation Plan's initiatives were inadequate to reduce the Company's debt in any significant way to avoid bankruptcy. Instead, Defendant McCollum dismissed the poor earnings results and lack of progress as mere "***bumps in the road***," and continued touting to investors that they would achieve their targets without delay.

314. For instance, Defendant McCollum assuaged investors by reiterating, "I'm confident that we'll achieve our $1 billion incremental EBITDA run rate target in accordance with our original time line," and Defendant Bausch joined in on the narrative and touted that "for the entire year, we will generate positive cash flow in 2019."

315. Notably, when asked point-blank on February 1, 2019, during the 4Q 2018 Earnings Call, whether Defendants are considering bankruptcy protection, Defendant McCollum unequivocally responded, "I don't waste a lot of time thinking or planning how to fail." Defendant McCollum further explained in a press release issued on the same day that Defendants had "sufficient liquidity to continue to execute on our strategic initiatives and pay down our near-term maturities."

316. Analysts undoubtedly understood Defendants' statements as conveying the message that Defendants were not considering bankruptcy and that the Company had sufficient liquidity to meet its debt obligations. Indeed, specifically referencing Defendant McCollum's statement about not thinking about how to fail, a February 1, 2019 analyst report by RBC Capital Markets reported: "Bottom line, the CEO sees no reason for WFT to consider a bankruptcy/capital restructuring." The same report noted that "WFT has sufficient liquidity to address the 2020 debt."

317. Similarly, a Credit Suisse analyst report issued that same day referred to Weatherford as "[n]ot [d]ead [y]et." The report continued: "[i]n our opinion, WFT is not likely to declare bankruptcy in 2019. This is the 1st, 2nd, and often the 3rd question asked about WFT. . . . The company is on track to achieve the goal they set out over a year ago." The Credit Suisse report also noted that "completion of transformational efforts and Ebitda uplift are still promised." Moreover, citing the Transformation Scorecards published by the Company each quarter, Credit Suisse reported that "[t]he two-year transformation plan appears on track."

318. An analyst report issued by UBS that same day also took comfort in the fact that the Company announced that it would have "'sufficient liquidity' to continue to execute their strategic initiatives and pay down near-term maturities." Also on February 1, 2019, Wolfe Research issued an analyst report stating that Weatherford "remains on track to achieve the full $1 [billion] run rate." The media also was convinced that there was no chance Weatherford would file bankruptcy.

319. For example, that same day a Houston Chronicle news article believed Weatherford "is not going to file for bankruptcy." Analysts continued to express their positive outlook days later as a response to Defendants' misstatements. On February 4, 2019, JP Morgan

issued an analyst report stating: “We were encouraged by WFT’s reiterated confidence in its transformation program.” That same day, Jefferies issued an analyst report that indicated that “we don’t disagree with the company’s contention that it has liquidity runway to muddle through.”

320. On Friday, May 10, 2019, the full truth concerning the Transformation Plan’s initiatives being inadequate to reduce the Company’s debt in any significant way to avoid bankruptcy were fully revealed and/or materialized. On that date, Defendant McCollum disclosed that Defendants “still face a high level of debt that affects our ability to make investments in our Company and implement further elements of our [T]ransformation [P]lan,” and as such, the Company executed a restructuring support agreement with a group of its senior noteholders, which would be implemented through a “pre-packaged” Chapter 11 process whereby Weatherford would file for U.S. Chapter 11 protection. At the same time, Defendants also announced—in a complete reversal of what Defendants had been touting throughout the Class Period—that “the Company believes that it will not be able to generate sufficient liquidity to service all of its debt and other obligations or comply with its debt covenants at some point within the next twelve months.”

321. Analysts and the media were shocked by the bankruptcy announcement and were upset that Defendants had concealed Weatherford’s true financial condition. On Saturday, May 11, 2019, the day after the RSA was announced, for the first time realizing the Transformation Plan’s initiatives were not enough to save Weatherford, Bloomberg News reported that “[d]ebt of $8 billion became unsustainable as revenue faded.”

322. The next day, on May 12, 2019, Simmons Energy issued an analyst report, explaining, “[i]n the end, [Weatherford] went away quietly into the night this past Friday, filing a

10Q which revealed its insolvency and its corresponding attempts to reorganize." Furthermore, the report stated that "[t]he surprise wasn't so much the outcome of [Weatherford's] declared insolvency but the duration of the company's purgatory." In other words, even if analyst Simmons Energy had a feeling Weatherford would eventually one day have to declare bankruptcy, Simmons Energy was at least under the impression that the possibility of bankruptcy was way down the road. Simmons Energy's analyst report continued to explain that "there continued to be ongoing rationalizations about the unrelenting consumption cash," which "was an economically unsustainable reality given the company's unyielding debt load." The report continued: "As, if not more, important, was the lack of visibility burdening the company in the form of 'the retention of our key personnel, access to debt and equity credit at suitable terms, our level of working capital and our ability to execute within our targeted timing on our transformation.'"

323. On May 13, 2019, Wolfe Research published an analyst report that again took issue with Weatherford's lack of transparency. For example, in addition to dropping coverage on Weatherford, the report explained that "we didn't have enough visibility into refinancing options to determine if/when the company would file for bankruptcy protection."

324. As a result of this shocking and devastating news, the NYSE suspended trading in the Company's ordinary shares effective prior to the market open on Monday, May 13, 2019, and announced its intention to commence proceedings to delist the Company's ordinary shares from the NYSE. Trading of the Company's ordinary shares on the OTC Bulletin Board or "pink sheets" market commenced on May 14, 2019 under the symbol "WFTIF." Then, on Tuesday, May 14, 2019, the next trading day since Defendants' May 10, 2019 bankruptcy announcement,

Weatherford's share price plummeted ***86.49%***, closing at $0.05 per share down from May 10, 2019's closing price of $0.37 per share.

## VII. LOSS CAUSATION

325. During the Class Period, as detailed herein, Defendants engaged in a course of conduct that artificially inflated or artificially maintained the price of Weatherford's common stock and operated as a fraud or deceit on Class Period purchasers of Weatherford common stock by failing to disclose and misrepresenting the Transformation Plan's inability to adequately cut down the Company's massive debt and avoid bankruptcy, as detailed herein.

326. Class members unknowingly and in reliance upon Defendants' materially false or misleading statements and/or omissions purchased Weatherford common stock at artificially inflated prices. But for Defendants' misrepresentations, omissions, and fraudulent scheme, Lead Plaintiff and other Class members would not have purchased Weatherford stock at the artificially inflated prices at which it traded during the Class Period.

327. The truth regarding Defendants' fraud was revealed in a series of partial corrective disclosures and/or materializations of concealed risk that occurred between October 29, 2018 and May 10, 2019. During this corrective disclosure period, Weatherford's stock fell precipitously as the artificial inflation caused by Defendants' unlawful conduct exited Weatherford's stock price. It was not until the final partial corrective disclosure and/or materialization of concealed risk on May 10, 2019 that the full truth was known to the market such that there was no longer any artificial inflation in Weatherford's stock price attributable to the fraud.

328. The declines in Weatherford's stock price during the corrective disclosure period, including the declines summarized below, are directly attributable to the market absorbing

information that corrected and/or reflected the materialization of risks concealed by the Defendants' material misrepresentations or omissions.

329. As a result of their purchases of Weatherford common stock during the Class Period, Lead Plaintiff and the other Class members suffered economic loss (*i.e.*, damages) under the federal securities laws. Defendants' materially false and misleading statements had the intended effect and caused Weatherford common stock to trade at artificially inflated levels throughout the Class Period, reaching as high as $7.09 per share on March 7, 2017.

330. By concealing from investors the adverse facts detailed herein, Defendants presented a misleading picture of Weatherford's financial health and future viability. As the truth about the Company and the extent of the fraud was revealed to the market, the price of Weatherford common stock fell significantly. These declines removed the inflation from the price of Weatherford common stock, causing real economic loss to investors who had purchased Weatherford common stock during the Class Period.

**A. October 29, 2018 – First Partial Corrective Disclosure/Materialization of the Risk**

331. On October 29, 2018, the relevant truth and foreseeable risks concealed by Defendants' misconduct and their false representations and omissions during the Class Period were revealed and/or partially materialized in connection with Weatherford's release of its financial results for the third quarter of 2018. On that date, Defendants announced a loss of $199 million for the third quarter of 2018 and an adjusted free cash flow of negative $35 million, which Defendant Bausch disclosed was "short of our goal of positive cash flow for the quarter."

332. Notably, Defendant McCollum conceded that Defendants "knew coming into the year" that Weatherford "would probably still fall somewhat short in 2018 for generating breakeven cash flow." Defendants further partially revealed for the first time that progress

towards their targets has been slower than they have wanted. Indeed, Defendant McCollum disclosed "[t]he working capital opportunity remains. We still think we can get it, but the pace of getting that out has been slower than we wanted." Defendant McCollum further disclosed "[w]hat we didn't see and what was kind of worked against us this year was that, particularly on receivables, that our DSOs [Days Sales Outstanding] increased, partly as a result of some customer actions."

333. The October 29, 2018 disclosures that Defendants were short of their positive cash flow goal, that progress of achieving their other targets were slower than expected, and that the Company experienced a significant loss for the quarter, were foreseeable consequences of, and within the zone of risk concealed by, Defendants' misrepresentations and omissions concerning the Transformation Plan's initiatives failing to reduce the Company's debt, and in fact, causing further harm to the Company, thereby solidifying the notion that bankruptcy was imminent.

334. Moreover, the October 29, 2018 disclosures revealed new information that Defendants' misstatements, omissions, and fraudulent course of conduct previously concealed and/or obscured from the market. These disclosures partially (but incompletely) revealed some of the relevant truth concealed and/or obscured by Defendants' prior misstatements and omissions surrounding the Transformation Plan and the Company's financial condition, including the Transformation Plan's purported significant and tremendous progress as well as Defendants supposedly being on track—in light of analyses they claimed were performed at the time of their misstatements—to achieve their financial targets and avoid bankruptcy.

335. As a direct and proximate result of these partial corrective disclosures and/or materializations of foreseeable risks concealed by Defendants' fraud, Weatherford's stock price

fell ***22.22%*** from $1.98 per share at close on Friday, October 26, 2018, to $1.54 per share at close on Monday, October 29, 2018. Weatherford's stock price further fell to $1.26 per share at close on October 30, 2018, an ***additional 18.18%***, as the market further digested the troubling news.

336. However, despite these partial disclosures of adverse news which removed some of the artificial inflation in Weatherford's stock price, its stock price remained artificially inflated after this announcement as Defendants knew and failed to disclose or deliberately disregarded that the Transformation Plan's initiatives were inadequate to reduce the Company's debt in any significant way to avoid bankruptcy. Instead, Defendant McCollum dismissed the poor earnings results and lack of progress as mere "bumps in the road," and Weatherford continued touting to investors that they would achieve their targets without delay. For instance, Defendant McCollum assuaged investors by reiterating, "I'm confident that we'll achieve our $1 billion incremental EBITDA run rate target in accordance with our original time line," and Defendant Bausch joined in on the narrative and touted that "for the entire year, we will generate positive cash flow in 2019."

337. Notably, when asked point-blank on February 1, 2019, during the 4Q 2018 Earnings Call, whether Defendants are considering bankruptcy protection, Defendant McCollum unequivocally responded, "I don't waste a lot of time thinking or planning how to fail." Defendant McCollum further explained in a press release issued on the same day that Defendants had "sufficient liquidity to continue to execute on our strategic initiatives and pay down our near-term maturities."

**B. May 10, 2019 – Final Corrective Disclosure/Materialization of the Risk**

338. On Friday, May 10, 2019, the relevant truth and foreseeable risks concealed by Defendants' misconduct and their false representations and omissions during the Class Period

were fully revealed and/or materialized. On that date, Defendants disclosed that Defendants "still face a high level of debt that affects our ability to make investments in our Company and implement further elements of our [T]ransformation [P]lan," and as such, the Company executed a restructuring support agreement with a group of its senior noteholders, which would be implemented through a "pre-packaged" Chapter 11 process whereby Weatherford would file for U.S. Chapter 11 protection. At the same time, Defendants also announced—in a complete reversal of what Defendants had been touting throughout the Class Period—"the Company believes that it will not be able to generate sufficient liquidity to service all of its debt and other obligations or comply with its debt covenants at some point within the next twelve months."

339. The May 10, 2019 disclosures that Weatherford would have to file for Chapter 11 bankruptcy protection, that the Company's high debt levels affected its ability to make investments into the Company, and that the Company was unable to generate sufficient liquidity to service its debt, were foreseeable consequences of, and within the zone of risk concealed by, Defendants' misrepresentations and omissions concerning the Transformation Plan's initiatives failing to reduce the Company's debt, and in fact, causing further harm to the Company, thereby solidifying the notion that bankruptcy was imminent. Moreover, the May 10, 2019 disclosures revealed new information that Defendants' misstatements, omissions, and fraudulent course of conduct previously concealed and/or obscured from the market. These disclosures revealed the relevant truth concealed and/or obscured by Defendants' prior misstatements and omissions surrounding the Transformation Plan and the Company's financial condition, including the Transformation Plan's purported significant and tremendous progress as well as Defendants supposedly being on track—in light of analyses they claimed were performed at the time of their misstatements—to achieve their financial targets and avoid bankruptcy.

340. As a result of this shocking and devastating news, the NYSE suspended trading in the Company's ordinary shares effective prior to the market open on Monday, May 13, 2019, and announced its intention to commence proceedings to delist the Company's ordinary shares from the NYSE. Trading of the Company's ordinary shares on the OTC Bulletin Board or "pink sheets" market commenced on May 14, 2019 under the symbol "WFTIF." Then, on Tuesday, May 14, 2019, the next trading day since Defendants' May 10, 2019 bankruptcy announcement, Weatherford's share price plummeted ***86.49%***, closing at $0.05 per share down from May 10, 2019's closing price of $0.37 per share.

341. Analysts directly connected the stock price decline to the disclosure of having to file for bankruptcy, having too much debt, and not having sufficient liquidity to meet is debt obligations. On Saturday, May 11, 2019, Bloomberg News reported that "[d]ebt of $8 billion became unsustainable as revenue faded," and the next day, May 12, 2019, Simmons Energy issued an analyst report, explaining "[i]n the end, [Weatherford] went away quietly into the night this past Friday, filing a 10Q which revealed its insolvency and its corresponding attempts to reorganize." On May 13, 2019, analyst Wolfe Research similarly reported that "we didn't have enough visibility into refinancing options to determine if/when the company would file for bankruptcy protection."

342. Each decline in the price of Weatherford common stock, as detailed above, was a direct or proximate result of the nature and extent of Defendants' fraudulent misrepresentations being revealed to investors and the market. The timing and magnitude of the price declines in Weatherford common stock negate any inference that the loss suffered by Lead Plaintiff and the other Class members was caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to Defendants' fraudulent conduct.

343. The economic loss, *i.e.*, damages, suffered by Lead Plaintiff and the other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the price of Weatherford common stock and the subsequent significant decline in the value of Weatherford common stock when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

344. The market for Weatherford common stock was open, well-developed, and efficient at all relevant times, with average daily trading volume of approximately 23,227,449 trades during the Class Period. As a result of Defendants' misstatements and material omissions, as alleged herein, Weatherford's common stock traded at artificially inflated prices. Lead Plaintiff and other Class members purchased Weatherford common stock relying upon the integrity of the market relating to Weatherford common stock and suffered economic losses as a result thereof.

345. The economic loss, *i.e.*, damages, suffered by Lead Plaintiff and other Class members was a direct result of Defendants' misrepresentations artificially inflating Weatherford's stock price and the subsequent significant decline in the value of Weatherford common stock when the truth was revealed on October 29, 2018 and May 10, 2019.

346. The declines in Weatherford's common stock price on October 29, 2018, October 30, 2018, and May 14, 2019 were a direct result of the nature and extent of Defendants' prior misstatements and omissions being revealed to investors after the markets closed on October 29, 2018 and May 10, 2019. The timing and magnitude of Weatherford's stock price decline evidence the impact Defendants' statements had on the Company's stock price during the Class Period and negate any inference that the loss suffered by Lead Plaintiff and other Class members

was caused by changed market conditions or macroeconomic, industry, or Company-specific factors unrelated to Defendants' fraudulent conduct.

347. Indeed, on the same day that Weatherford's common stock share price closed down ***over 86%***, the Standard & Poor's 500 Index and Dow Jones Industrial Index ***increased*** 0.80% and 0.82%, respectively. Moreover, there was no news about Weatherford, other than the disclosures in the October 29, 2018 press release and earnings call, and the May 10, 2019 press release that could fully explain the Company's stock price declines on October 29, 2018, October 30, 2018, and May 14, 2019.

## VIII. ADDITIONAL INDICIA OF SCIENTER

348. Defendants were active and culpable participants in the fraud, as evidenced by their knowing and reckless issuance and/or ultimate authority over Weatherford's and the Individual Defendants' materially false or misleading statements and omissions. The Individual Defendants acted with scienter in that they knew or recklessly disregarded that the public statements more specifically set forth in Section V were materially false or misleading when made, and knowingly or recklessly participated or acquiesced in the issuance or dissemination of such statements as primary violators of the federal securities laws. In addition to the specific facts alleged above, Defendants' scienter is further evidenced by the following facts.

### A. The Transformation Plan's Ability to Pay Down the Company's Massive Debt Was Critical to Weatherford's Continued Viability

349. *First*, the Individual Defendants' knowledge of the Transformation Plan's progress and inability to adequately address the Company's over $7 billion of debt so that the Company would not have to declare bankruptcy can be inferred because these facts were critical to Weatherford's continued viability. Indeed, substantially all of the Individual Defendants' efforts and expenditures during the Class Period were devoted to the Transformation Plan's

initiatives and their ability to pay down the Company's debt to avoid bankruptcy. Moreover, the Company's future viability was substantially dependent on the Transformation Plan's ability to effectively pay down the Company's debt. In other words, the success of the Transformation Plan's initiatives was critical to the Company's continued vitality.

350. The Individual Defendants themselves, numerous times, indicated that the Transformation Plan's efforts to cut down the debt on Weatherford's balance sheet were obviously important to them and the health of the Company. For example, Defendant McCollum acknowledged to investors on April 28, 2017 during an earnings call for the first quarter of 2017 that "***the biggest single challenge ahead of us is getting the debt down***."

351. Defendant McCollum then, throughout the Class Period, repeatedly explained that reducing Weatherford's debt was his top priority, and further stated during the 2Q 2017 Earnings Call on July 28, 2017 that he himself was even holding staff meetings at his level to hold his workers accountable for the transformation efforts. As such, Defendant McCollum was familiar with Weatherford's day-to-day operations regarding the cost-cutting measures and the Company's progress of debt reduction. To be sure, Defendants' First Day Declaration acknowledged that in the second quarter of 2017, the "Company's management team and the board of directors accordingly engaged in an extensive review of all existing protocols and processes" to "assess[] the structure and operations of the Company in order to determine where key cost-reduction initiatives could be implemented."

352. Similarly, during a UBS Global Oil and Gas Conference held on May 22, 2018, Defendant McCollum informed investors that he "got procurement experts, sales experts, manufacturing experts who were sitting with our team to not only coach them but to help give me feedback." In other words, Defendant McCollum was not merely managing the

Transformation Plan at a high level; instead, Defendant McCollum was made aware of the Transformation Plan's specific progress by individuals charged with implementing the initiatives. Moreover, during the third quarter of 2018 earnings call on October 29, 2018, Defendant McCollum reiterated that "***[o]ur main priority is to continue executing on the transformation***."

353. The Transformation Plan's ability to achieve the Company's targets was so important to Defendant McCollum, that at one point during the Class Period he had even put his own job on the line. Specifically, during the Credit Suisse Energy Summit Conference on February 13, 2018, Defendant McCollum stated:

> We have a clear line of sight on the target as well as a disciplined process in place, designed to ensure that we can deliver. This is an undeniable, it's a realistic, and most importantly, it's an achievable goal. ***I'm staking my career on that.***

354. Defendant Bausch also himself indicated and publicly announced that the Transformation Plan and paying down the Company's debt was his number one priority. For instance, Defendant Bausch, as CFO, purposefully became heavily involved in Weatherford's recovery and transformation efforts. Indeed, Defendant Bausch himself stated: "As the new CFO of Weatherford my top priorities are: debt reduction, free cash flow generation, improving profitability, disciplined capital allocation and improved predictability going forward."

355. Defendant Shivram similarly acknowledged that the Transformation Plan and cutting down the Company's massive debt was Defendants' top priority. For instance, on February 2, 2017, during the 4Q 2016 Earnings Call, Defendant Shivram touted: "We believe this debt reduction journey, as I have explained it, is eminently achievable and ***it is the single highest priority of the Company to reduce net debt below $3 billion by 2021***."

356. Furthermore, as FE 14 explained, Defendant Duroc-Danner stated in October 2016 that the Company would be able to manage its debt only to put on a good public face. FE 14 explained that there was a war going on to get rid of Defendant Duroc-Danner by then, and that [Duroc-Danner] was grasping at straws by then. FE 14 further stated that when he listened to any earnings calls, the reality seemed glossed over. FE 14 explained that Defendants would "fluff" Weatherford's true financial condition, but FE 14 and his co-workers knew the truth; they knew Weatherford was in serious trouble.

357. That the Company's Transformation Plan's ability to pay down its debt and avoid bankruptcy, and thus critical to Weatherford's viability, is further demonstrated by analysts' and investors' constant focus on the progress of Defendants' cost-cutting initiatives. Analysts had also recognized that cutting the Company's debt was Defendants' top priority. For instance, on June 8, 2017, analyst Gabelli & Company, after meeting with Defendant McCollum, reported that "Mr. McCollum's top focus and biggest priority is deleveraging the balance sheet."

358. Furthermore, there is no doubt that the Transformation Plan's efforts of paying down Weatherford's debt to allow for the Company's continued viability was of the utmost importance. In fact, this concern from investors was directly brought to the attention of Weatherford's Board of Directors. For example, Q Investments, a Texas-based hedge fund and activist investor in Weatherford, became concerned with Weatherford's massive debt remaining on its balance sheet, and therefore drafted and sent a letter to Weatherford's Board of Directors on June 21, 2018. The letter's purpose was to ask the Board to consider "alternatives if Weatherford's planned $1 billion improvement in operating results becomes another broken promise." The activist investor expressed concerns over Weatherford having "too much leverage" and "whatever incremental positive internal steps the Company can take will not solve

the issue." Moreover, as a J.P. Morgan analyst report dated July 28, 2017 explained a year earlier, "[i]nvestor focus remains on the company's plans for accelerated debt reduction and strategic realignment."

359. Because the cost-cutting measures were the top priority at Weatherford, the Individual Defendants necessarily would have known about the gross disparity between the revenue generated by selling parts of the Company's business and the remaining massive debt on the balance sheet. Similarly, the Individual Defendants would have known about the Company's policy of delaying payments to its vendors and contractors. To therefore believe that the Individual Defendants were not aware of the undisclosed financial issues permeating Weatherford defies all logic.

360. Thus, knowledge of the Transformation Plan's inability to combat the Company's massive debt and avoid bankruptcy can be imputed to the Individual Defendants.

### B. Defendants' Statements Support a Strong Inference of Scienter

361. *Second*, as discussed above, Defendants spoke at length during the Class Period about the Transformation Plan making "***significant***" and "***material***" progress and being "***on track***" to achieving certain targets, the Company's cost-cutting measures being "***permanent and sustainable.***" Defendants similarly assuaged any bankruptcy concerns by explaining that they "***don't waste a lot of time thinking or planning how to fail***."

362. These false and misleading statements, and others like it, provide a strong inference that Defendants were aware of or, at the very least, were reckless in not knowing about the Transformation Plan's many issues that inhibited its ability to reduce the Company's debt in any significant way or to avoid the inevitable bankruptcy. Accordingly, Defendants breached their duty under the federal securities laws by speaking on these topics and failing to fully disclose all relevant material information while doing so.

363. During the Class Period, each of the Defendants unambiguously assured investors that the Transformation Plan was making significant progress and on track to reducing the Company's debt or that despite the massive debt that Weatherford had on its balance sheet, the Company's future viability was not at risk, yet none of them relayed to investors that the Transformation Plan was wholly inadequate to address the over $7 billion in debt and had close to no chance of preventing bankruptcy. For example, on September 5, 2018, Defendants participated in the Barclays Energy Power CEO Conference, where Defendant McCollum continued to tout to investors that "***we've made impressive progress in our transformation***" and that Weatherford was making "***material progress***" in its "***transformation, which is on target and driving us forward on our journey to sustainable profitability***."

364. Defendants likewise continuously led investors to believe that the Company's financial condition was better than it really was as evidenced by the fact that the Company was purportedly conducting business as usual, such as by paying its bills in a timely fashion. For instance, on October 26, 2016, during the earnings call for the third quarter of 2016, Defendant Shivram told investors that Defendants "***have been making normal payments to our vendors, which in a sense is similar to paying down debt obligations***."

365. Furthermore, during an interview on November 9, 2016, Defendant Duroc-Danner asserted that despite the Company's high indebtedness he saw "***no remote possibility***" that the Company would not be able to manage its debt.

366. Similarly, during the 4Q 2018 Earnings Call on February 1, 2019, Defendant McCollum assuaged investors' concerns about the Company's need to file for bankruptcy. For instance, on that earnings call, a RBC analyst asked Defendant McCollum:

> And with the stock trading where it is, right, the elephant in the room and the question of the day is more like along the lines of given the dynamics at play,

> ***what, in your mind, would have to occur for there to be some serious consideration around the lines of a capital restructuring or voluntary sort of bankruptcy?*** That seems to be the question I'm getting most often from investors. So maybe you could provide your perspective on that.

367. Instead of coming clean and explaining to investors the actual state Weatherford's financials, Defendant McCollum responded by stating, "***I don't waste a lot of time thinking or planning how to fail***" and explaining that "***the actions that we can take is continuing to execute the [T]ransformation [P]lan and do that quarter in and quarter out and continue to improve the profitability***, which ultimately will drive the cash flow of this organization and improve our credit metrics."

368. That same day, Weatherford issued a press release announcing its fourth quarter of 2018 earnings results, and Defendant McCollum was quoted as stating that Defendants had "***sufficient liquidity to <u>continue</u> to execute on our strategic initiatives and pay down our near-term maturities***."

369. Notably, at the same time as Defendants' statements were made, Defendants knew or had access to facts that directly contradicted their statements. As explained above, the Company's management had access to the monthly profit and loss statements, which were tracked on the Company's internal JDE (JD Edwards System), and which, as FE 3 explained, indicated that Weatherford was delaying the inevitable, referring to bankruptcy. The Company also routinely held meetings to discuss the Transformation Plan's progress, and critically, issues that the Transformation Teams were encountering while trying to implement the initiatives.

370. Former employees explained that at these meetings, the issues with the Transformation Plan was raised to McKinsey and vice presidents, and ultimately reported back. And as FE 5 recalled, on occasion Defendant Blanchard attended the meetings that he attended. Additionally, FE 8 recounted that the Company held quarterly meetings that were "all hands-on

deck" led by Defendant McCollum where financial results would be highlighted; in other words, Defendants stayed apprised of the then-financial condition of the Company throughout the Class Period. Moreover, Defendant McCollum personally stayed apprised of the Transformation Plan's progress as he explained during the 2Q 2017 Earnings Call on July 28, 2017 that he himself was even holding staff meetings at his level to hold his workers accountable for the transformation efforts.

371. By repeatedly insisting that the Transformation Plan was making significant progress and was on track to achieving the Company's financial targets, such as reducing the Company's massive debt, and that such cost-cutting measures were ensuring Weatherford's continued viability, Defendants either (1) knew that the Transformation Plan's initiatives were failing to reduce the debt and thus that bankruptcy would have been Weatherford's only option; or (2) were reckless in not knowing or investigating that this was the case. Under either scenario, there is a strong inference that Defendants made these statements with scienter.

**C. Defendants Admitted They Would Not Meet Their Targets**

372. *Third*, as mentioned above, on October 29, 2018, the date of the first partial corrective disclosure, Defendants in fact admitted that they knew from prior to 2018 that they would not be able to achieve all of the financial targets they touted. Specifically, Defendant McCollum conceded: "***We knew coming into the year***, if we try to guide The Street, that ***we weren't going to necessarily get all the way there*** even though it will be a substantial increase over 2017, ***that we would probably still fall somewhat short in 2018 for generating breakeven cash flow***."

**D. Defendants Were Motivated to Negotiate the Management Incentive Plan**

373. *Fourth*, Defendants were motivated and incentivized throughout the Class Period to misrepresent to investors the true state of Weatherford's financial situation and to delay the

inevitable filing of bankruptcy because Defendants needed enough time to negotiate with their creditors a sweetheart deal under which management could receive up to 5% ownership in the reorganized company ("NewCo").

374. Indeed, as mentioned above, the RSA provides that 5% of the New Common Stock is to be set aside as part of a management incentive plan as a reward for executives (the "Management Incentive Plan"). The New Common Stock issued under the Management Incentive Plan will dilute all of the New Common Stock equally, meaning shareholders will receive even less than the remaining 1%.

375. Under the terms of the Management Incentive Plan, the Individual Defendants stood to gain a windfall as result of negotiating such a deal for themselves. For instance, on April 30, 2019, prior to the bankruptcy, Weatherford's named executive management held approximately 0.37% of Weatherford.[10] After confirmation of the Chapter 11 Plan, however, the Company's management will stand to own up to 5% of the fully deleveraged new company that emerges from bankruptcy.

376. Specifically, the Management Incentive Plan provides that NewCo "will adopt a management incentive plan, which management incentive plan shall reserve up to 5.0% of the New Common Stock in the Reorganized Company on a fully diluted basis, and which shall be on the terms and conditions (including any and all awards granted thereunder) to be determined at the discretion of the New Board (including, without limitation, with respect to the participants, allocation, timing, and the form and structure of the options, warrants, and/or equity compensation."

[10] The 0.37% figure was compiled by aggregating the amount of securities beneficially owned by the Debtors' five named executives from their most recent SEC Form 4s. See SEC Form 4, Weatherford International plc (February 4, 2019; February 4, 2019; February 7, 2019; June 10, 2019; April 24, 2019).

377. In other words, the deal Defendants negotiated provided that management could get 400% more recovery than the current shareholders will receive.

## IX. CONTROL PERSON ALLEGATIONS

378. The Individual Defendants, by virtue of their high-level positions at Weatherford, directly participated in the management of the Company, were directly involved in the day-to-day operations of the Company at the highest levels, and were privy to confidential proprietary information about the Company, its business, operations, internal controls, growth, financial statements, and financial condition as alleged herein. As set forth below, the materially misstated information conveyed to the public was the result of the collective actions of these individuals.

379. Defendants Duroc-Danner, Shivram, McCollum, Bausch, Fraser, Mills and Blanchard, as senior executive officers of Weatherford, and Defendants Duroc-Danner and McCollum as directors of Weatherford—a publicly held company whose common stock was, and is, traded on the NYSE, and governed by the federal securities laws—each had a duty to disseminate prompt, accurate, and truthful information with respect to the Company's business, operations, internal controls, growth, financial statements, and financial condition, and to correct any previously issued statements that had become materially misleading or untrue, so that the market prices of Weatherford's publicly-traded common stock would be based on accurate information. The Individual Defendants each violated these requirements and obligations during the Class Period.

380. Defendants Duroc-Danner, Shivram, McCollum, Bausch, Fraser, Mills and Blanchard, because of their positions of control and authority as senior executive officers of Weatherford, and Defendants Duroc-Danner and McCollum, as Weatherford directors, were able to and did control the content of Weatherford's SEC filings, press releases, and other public

statements issued by or on behalf of Weatherford during the Class Period. Each would have been provided with copies of the statements made in the SEC filings at issue in this action before they were issued to the public and would have had the ability to prevent their issuance or cause them to be corrected. Accordingly, the Individual Defendants are responsible for the accuracy of the public statements alleged herein.

381. The Individual Defendants are liable as participants in a fraudulent scheme and course of conduct that operated as a fraud or deceit on purchasers of Weatherford common stock by disseminating materially false and misleading information, and concealing and omitting material adverse facts. The scheme deceived the investing public regarding Weatherford's business, operations, and management and execution of customer contracts, and the intrinsic value of Weatherford's common stock and options, and caused Lead Plaintiff and members of the Class to purchase Weatherford common stock and options at artificially inflated prices.

## X. CLASS ACTION ALLEGATIONS

382. Lead Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons and entities who purchased or otherwise acquired the publicly traded securities, including common stock and exchange-traded options on such common stock, of Weatherford during the Class Period and were damaged thereby. Excluded from the Class are: (i) Defendants; (ii) members of the immediate family of any Defendant who is an individual; (iii) any person who was an officer or director of Weatherford during the Class Period; (iv) any firm, trust, corporation, or other entity in which any Defendant has or had a controlling interest; (v) Weatherford's employee retirement and benefit plan(s) and their participants or beneficiaries, to the extent they made purchases through such plan(s); and (vi) the legal representatives, affiliates, heirs, successors-in-interest, or assigns of any such excluded person.

383. The members of the Class are so numerous that joinder of all members is impracticable. According to its quarterly and annual reports filed with the SEC, during the Class Period, Weatherford had approximately 897 million to 1 billion shares of common stock outstanding and was actively traded on the NYSE under the ticker symbol "WFT." While the exact number of Class members is unknown to Lead Plaintiff at this time, and such number can only be ascertained through appropriate discovery, Lead Plaintiff believes that the proposed Class has thousands of members and is widely dispersed geographically. Record owners and other members of the Class may be identified from records maintained by Weatherford and/or its transfer agent and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

384. Lead Plaintiff's claims are typical of the claims of the members of the Class. All members of the Class were similarly affected by Defendants' allegedly wrongful conduct in violation of the Exchange Act as complained of herein.

385. Lead Plaintiff will fairly and adequately protect the interests of the members of the Class. Lead Plaintiff has retained counsel competent and experienced in class and securities litigation.

386. Common questions of law and fact exist as to all members of the Class, and predominate over questions solely affecting individual members of the Class. The questions of law and fact common to the Class include, but are not necessarily limited to, the following:

(a) Whether Defendants violated the federal securities laws by their acts and omissions alleged herein;

(b) Whether the statements Defendants made to the investing public during the Class Period contained material misrepresentations or omitted to state material information;

(c) Whether, and to what extent, the market price of Weatherford common stock and exchange-traded options on such common stock was artificially inflated during the Class Period because of the material misstatements alleged herein;

(d) Whether Defendants acted with the requisite level of scienter;

(e) Whether the Individual Defendants were controlling persons of Weatherford;

(f) Whether the members of the Class have sustained damages as a result of the conduct complained of herein, and if so, the proper measure of such damages.

387. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy because, among other things, joinder of all members of the Class is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## XI. APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE

388. To the extent that Lead Plaintiff alleges that Defendants made affirmative misstatements, Lead Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

(a) Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b) the omissions and misrepresentations were material;

(c) the Company’s securities traded in an efficient market;

(d) the misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities;

(e) Lead Plaintiff and other members of the Class purchased Weatherford's securities between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts;

(f) Weatherford stock met the requirements for listing and were listed and actively traded on the NYSE, a highly efficient and automated market;

(g) as a regulated issuer, Weatherford filed periodic public reports with the SEC and the NYSE;

(h) Weatherford regularly communicated with public investors via established market communication mechanisms, including regular dissemination of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(i) Weatherford was followed by numerous securities analysts employed by major brokerage firms including, but not limited to, Wells Fargo Securities, J.P. Morgan, Jefferies, UBS, Credit Suisse, Guggenheim, Gabelli & Company, Barclays, Cowen and Company, and SunTrust Robinson Humphrey, all of which wrote reports that were distributed to the sales force and certain customers of their respective brokerage firm(s) and that were publicly available and entered the public marketplace.

389. As a result of the foregoing, the market for Weatherford's securities promptly digested current information regarding Weatherford from publicly available sources and reflected such information in Weatherford's securities price(s). Under these circumstances, all

persons and entities who purchased or otherwise acquired Weatherford's securities during the Class Period suffered similar injuries through their purchase of Weatherford at artificially inflated prices and thus, the presumption of reliance applies.

390. The material misrepresentations and omissions alleged herein would tend to induce a reasonable investor to misjudge the value of Weatherford's common stock.

391. Without knowledge of the misrepresented or omitted material facts alleged herein, Lead Plaintiff and other members of the Class purchased shares of Weatherford's common stock and exchange-traded options on such common stock between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed.

392. To the extent that the Defendants concealed or improperly failed to disclose material facts with respect to Weatherford's business, Lead Plaintiff is entitled to a presumption of reliance in accordance with *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153 (1972).

## XII. NO SAFE HARBOR

393. The statutory safe harbor provided by the PSLRA for forward-looking statements under certain circumstances does not apply to any of the materially false and misleading statements alleged in this pleading. First, many of the statements alleged to be false and misleading relate to historical facts or existing conditions. Second, to the extent any of the allegedly false and misleading statements may be characterized as forward-looking, they were not adequately identified as "forward-looking" statements when made. Third, any purported forward-looking statements were not accompanied by meaningful cautionary language because the risks that Defendants warned of had already come to pass.

394. To the extent any statements alleged to be false and misleading may be construed to discuss future intent, they are mixed statements of present or historical facts and future intent

and are not entitled to PSLRA safe-harbor protection—at least with respect to the part of the statement that refers to the present.

395. In addition, the PSLRA imposes an additional burden on oral forward-looking statements, requiring Defendants to include a cautionary statement that the particular oral statement is a forward-looking statement, and that "actual results might differ materially from those projected in the forward-looking statement." 15 U.S.C. § 78u-5(c)(2)(A)(i)-(ii). Defendants failed to both identify certain oral statements as forward-looking and include the cautionary language required by the PSLRA.

396. Furthermore, Defendants did not accompany their statements with meaningful cautionary language identifying important factors that could cause actual results to differ materially from any results projected. To the extent Defendants included any cautionary language, that language was not meaningful because any potential risks identified by Defendants had already passed or manifested. As detailed herein, Defendants failed to disclose to the market that, throughout the Class Period, Weatherford's Transformation Plan and cost-cutting measures were wholly inadequate and that bankruptcy and harm to the Company's financials were imminent in light of the Company's billions of dollars of indebtedness.

397. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements were made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, or the forward-looking statement was authorized or approved by an executive officer of Weatherford who knew that the statement was false when made.

## XIII. CAUSES OF ACTION

**COUNT I**

**Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Against All Defendants except Defendant Blanchard**

398. Lead Plaintiff repeats and realleges the above paragraphs as though fully set forth herein.

399. This Count is asserted pursuant to Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder by the SEC against all Defendants, except Defendant Blanchard.

400. As alleged herein, throughout the Class Period, Defendants, except Defendant Blanchard, individually and in concert, directly and indirectly, by the use of the means or instrumentalities of interstate commerce, the mails and/or the facilities of national securities exchanges, made untrue statements of material fact and/or omitted to state material facts necessary to make their statements not misleading and carried out a plan, scheme and course of conduct, in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. Defendants, except Defendant Blanchard, intended to and did, as alleged herein, (i) deceive the investing public, including Lead Plaintiff and members of the Class; (ii) artificially inflate and maintain the prices of Weatherford common stock; and (iii) cause Lead Plaintiff and members of the Class to purchase Weatherford common stock and options on such common stock at artificially inflated prices.

401. The Individual Defendants, except Defendant Blanchard, were individually and collectively responsible for making the false and misleading statements and omissions alleged herein and having engaged in a plan, scheme, and course of conduct designed to deceive Lead Plaintiff and members of the Class, by virtue of having made public statements and prepared,

approved, signed, and/or disseminated documents that contained untrue statements of material fact and/or omitted facts necessary to make the statements therein not misleading.

402. As set forth above, Defendants, except Defendant Blanchard, made their false and misleading statements and omissions and engaged in the fraudulent activity described herein knowingly and intentionally, or in such a deliberately reckless manner as to constitute willful deceit and fraud upon Lead Plaintiff and the other members of the Class who purchased Weatherford common stock and exchange traded options on such common stock during the Class Period.

403. In ignorance of the false and misleading nature of Defendants' statements and omissions, and relying directly or indirectly on those statements or upon the integrity of the market price for Weatherford common stock and exchange traded options on such common stock, Lead Plaintiff and other members of the Class purchased Weatherford common stock and options at artificially inflated prices during the Class Period. But for the fraud, Lead Plaintiff and members of the Class would not have purchased Weatherford common stock and options at such artificially inflated prices. As set forth herein, when the true facts were subsequently disclosed, the price of Weatherford common stock declined precipitously and Lead Plaintiff and members of the Class were damaged and harmed as a direct and proximate result of their purchases of Weatherford common stock and options at artificially inflated prices and the subsequent decline in the price of that stock when the truth was disclosed.

404. By virtue of the foregoing, Defendants, except Defendant Blanchard, are liable to Lead Plaintiff and members of the Class for violations of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## COUNT II

### Violation of Section 20(a) of the Exchange Act Against All Individual Defendants

405. Lead Plaintiff repeats and realleges the above paragraphs as though fully set forth herein.

406. This Count is asserted pursuant to Section 20(a) of the Exchange Act against the Individual Defendants.

407. The Individual Defendants had control over Weatherford and made the material false and misleading statements and omissions on behalf of Weatherford within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their executive leadership positions, positions as directors of Weatherford, and share ownership, as alleged above, the Individual Defendants had the power to influence and control and did, directly or indirectly, influence and control the decision making of the Company, including the content and dissemination of the various statements which Lead Plaintiff contends, were false and misleading. The Individual Defendants were provided with or had unlimited access to the Company's internal reports, press releases, public filings, and other statements alleged by Lead Plaintiff to be misleading prior to or shortly after these statements were issued, and had the ability to prevent the issuance of the statements or cause them to be corrected.

408. In particular, the Individual Defendants had direct involvement in and responsibility over the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein.

409. By reason of such wrongful conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of the Individual

Defendants' wrongful conduct, Lead Plaintiff and the other members of the Class suffered damages in connection with their purchases of the Company's shares during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiff prays for relief and judgment as follows:

A. Determining that this action is a proper class action, and certifying Lead Plaintiff as a Class representative under Rule 23 of the Federal Rules of Civil Procedure and Lead Plaintiff's counsel as Lead Counsel for the Class;

B. Awarding compensatory damages in favor of Lead Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be determined at trial, including pre-judgment and post-judgment interest, as allowed by law;

C. Awarding Lead Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D. Awarding such equitable/injunctive or other relief as deemed appropriate by the Court.

## JURY DEMAND

Lead Plaintiff demands a trial by jury.

DATED: March 16, 2020 Respectfully submitted,

*/s/ James W. Johnson*
**LABATON SUCHAROW LLP**
James W. Johnson (admitted pro hac vice)
Michael H. Rogers (admitted pro hac vice)
James T. Christie (admitted pro hac vice)
Philip J. Leggio (admitted pro hac vice)
140 Broadway
New York, New York 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477
jjohnson@labaton.com
mrogers@labaton.com
jchristie@labaton.com
pleggio@labaton.com

*Counsel for Lead Plaintiff Utah Retirement Systems and for the Class*

**Ajamie LLP**
Thomas R. Ajamie
Texas Bar No. 00952400
S.D. Tex. No. 6165
John S. "Jack" Edwards, Jr.
Texas Bar No. 24040851
S.D. Tex. No. 38095
Pennzoil Place – South Tower
711 Louisiana, Suite 2150
Houston, TX 77002
Telephone: (713) 860-1600
Facsimile: (713) 860-1699
tajamie@ajamie.com
jedwards@ajamie.com

*Liaison Counsel for the Class*

## CERTIFICATE OF SERVICE

I certify that on March 16, 2020, a true and correct copy of the foregoing document was filed with the Clerk of Court using the CM/ECF system, which will send electronic notification of such filing to all counsel of record.

*/s/ James W. Johnson*
James W. Johnson